[Cite as *State v. Harvey*, 2020-Ohio-329.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MARION COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

    v.

MARCUS G. HARVEY,

    DEFENDANT-APPELLANT.

CASE NO. 9-19-34

O P I N I O N

Appeal from Marion Municipal Court
Trial Court No. CRB1803052

**Judgment Affirmed**

Date of Decision: February 3, 2020

APPEARANCES:

    *Robert C. Nemo* for Appellant

    *Michael D. Swartz* for Appellee

**WILLAMOWSKI, J.**

{¶1} Defendant-appellant Marcus G. Harvey ("Harvey") appeals the judgment of the Municipal Court of Marion County, alleging that his two convictions are not supported by sufficient evidence; that his two convictions are against the manifest weight of the evidence; that the trial court erred by admitting evidence at trial in contravention of its prior ruling on a motion in limine; and that he was denied his right to the effective assistance of counsel. For the reasons set forth below, the judgment of the trial court is affirmed.

*Facts and Procedural History*

{¶2} On November 19, 2018, a Special Response Team ("SRT") with the Marion City Police Department went to execute an arrest warrant for Jacob Mullett ("Mullett") at 848 Adams Street in Marion County. Tr. 94, 133. After Lieutenant Josh Harris ("Lt. Harris") breached Mullett's door, fourteen or fifteen dogs ran outside of the house. Tr. 175. The SRT went inside and apprehended Mullett. Tr. 205. In response to this commotion, Harvey's girlfriend, Donna Artressia ("Donna"), came out of the house which was across the street from Mullett's residence and began to yell at the police officers about the dogs. Tr. 215-216, 235. Donna's mother, Misty Artressia ("Misty"), also came outside to see what was happening. Tr. 236.

{¶3} Around ten minutes after Donna came outside, Harvey emerged from the Artressias' house and approached Donna, who was still yelling and cursing at

the police officers. Tr. 217, 254. Around this time, Officer Nicholas Geurkink ("Officer Geurkink") was walking Mullett, who was handcuffed, to the back of his police cruiser. Tr. 206. At this point, Harvey walked into the middle of the street. Tr. 240. Officer Richard Wheeler ("Officer Wheeler") testified that Harvey was yelling various statements at the police. "F you guys." Tr. 97. "Let me see an F'ing search warrant." Tr. 101. "This is a declaration of war." Tr. 101. "This means war." Tr. 101.

{¶4} Officer Wheeler stated that Harvey was behaving aggressively and placed hands in his pockets as he approached the police. Tr. 101, 104. Lieutenant Mark Elliott ("Lt. Elliott") told Harvey that he "need[ed] to back up, you need to get out of the street or you're gonna be placed under arrest." Tr. 98. As Officer Wheeler and Lt. Elliott walked towards the defendant, Harvey began to step back. Officer Wheeler testified that Harvey was not complying with orders to take his hands out of his pockets. Tr. 119. The police officers testified that they were concerned that Harvey may have a weapon. Tr. 101, 155. At this point, the police informed Harvey that he was under arrest. Tr. 99.

{¶5} Officer Wheeler grabbed one of Harvey's arms while Lt. Elliott grabbed his other arm. Tr. 99. Officer Wheeler testified that he told Harvey to stop resisting arrest and that Harvey would still not remove his hands from his pockets. Tr. 102. Lt. Elliott testified that Donna was, at this point, swearing at the officers and was interfering with the arrest. Tr. 156. Lt. Harris came over to help Officer

Wheeler because Lt. Elliott was preoccupied with Donna. Tr. 102, 181. Lt. Harris stated that Harvey "turned more aggressive" and started "pushing, pulling away, resisting." Tr. 181.

{¶6} Eventually, the officers were able to get Harvey's hands out of his pockets and found that Harvey was clutching a key. Tr. 186. Lt. Harris testified that Harvey "had the key fob portion on the palm, and then the outside of his hand where the car key's sticking out, you can infer it was more like a stabbing weapon." Tr. 186. Lt. Harris stated that he told Harvey to drop the key multiple times but that Harvey refused to release the key. Tr. 187. Lt. Harris then warned Harvey that he (Harvey) was going to be tased if he did not comply. Tr. 187. At this point, Officer Geurkink gave Lt. Harris a taser. Tr. 208. The officers then tased Harvey. Tr. 188. Harvey then released the key from his hand. Tr. 188. The police then handcuffed Harvey and took him into custody. Tr. 188.

{¶7} On November 20, 2018, Harvey was charged with one count of resisting arrest in violation of R.C. 2921.33(A); one count of obstructing official business in violation of R.C. 2921.31; and one count of persistent disorderly conduct in violation of R.C. 2917.11(A)(2). Doc. 1, 2, 3. This case proceeded to a jury trial on May 1, 2019. Tr. 1. The State called Officer Wheeler, Officer Geurkink, Lt. Elliott, Lt. Harris, Donna, and Misty as witnesses. Tr. 277.

{¶8} After the State rested, Harvey testified in his own defense. He stated that he did not swear at the police officers or act in a belligerent manner. Tr. 269.

-4-

He stated that he approached the police with his hands behind his back and asked them if they had a warrant. Tr. 269. Harvey testified that the police responded to his question by saying, "[W]e got your f****** warrant." Tr. 272. He did admit that he, at some point, put his hands in his pockets. Tr. 269. Harvey also stated that the police did not tell him that he was under arrest and that he did not struggle with them. Tr. 256. He testified that he tried to let go of the key in his hands but the police officer's grip prevented him from doing so. Tr. 271.

{¶9} On May 1, 2019, the jury found Harvey guilty of one count of resisting arrest and one count of persistent disorderly conduct. Doc. 4, 37. The jury found Harvey not guilty of the charge of obstructing official business. Doc. 37. The appellant filed his notice of appeal on May 31, 2019. Doc. 46. On appeal, Harvey raises the following four assignments of error:

**First Assignment of Error**

**The jury's guilty verdict of persistent disorderly conduct was against the manifest weight of the evidence.[1]**

**Second Assignment of Error**

**The jury's guilty verdict of resisting arrest was against the manifest weight of the evidence.**

---

[1] While the caption of Harvey's first and second assignments of error only raise manifest weight challenges to his two convictions, the corresponding arguments, in the text of his brief, raise sufficiency of the evidence and manifest weight challenges to his two convictions. For this reason, we will perform both the manifest weight and sufficiency of the evidence analyses.

**Third Assignment of Error**

**The trial court erred by admitting previously precluded evidence on the stipulated video to go to the jury after sustaining appellant's motion in limine concerning a portion of the video.**

**Fourth Assignment of Error**

**Appellant was denied his constitutional right to effective assistance of counsel.**

*First Assignment of Error*

{¶10} Harvey argues that his conviction for persistent disorderly conduct was not supported by sufficient evidence because (1) the State "failed to prove appellant's language and/or conduct was likely to incite violence or encourage disobedience" and (2) the "alleged inconvenience only affected [the police officers in their] official capacity." Appellant's Brief, 13. He also argues that his conviction is against the manifest weight of the evidence.

Sufficiency of the Evidence Legal Standard

{¶11} A challenge to the sufficiency of the evidence supporting a conviction "is a question of law and a 'test of adequacy rather than credibility or weight of the evidence.'" *State v. Beaver*, 3d Dist. Marion No. 9-17-37, 2018-Ohio-2438, ¶ 40, quoting *State v. Berry*, 3d Dist. Defiance No. 4-12-03, 2013-Ohio-2380, ¶ 19. "The sufficiency-of-the-evidence analysis addresses the question of whether adequate evidence was produced for the case to be considered by the trier of fact and, thus, whether the evidence was 'legally sufficient to support the verdict * * *.'" *State v.*

Case No. 9-19-34

*Luebrecht*, 3d Dist. Putnam No. 12-18-02, 2019-Ohio-1573, ¶ 36, quoting *State v.*

*Worthington*, 3d Dist. Hardin No. 6-15-04, 2016-Ohio-530, ¶ 12. On appeal, the

applicable standard

> **is whether, after viewing the evidence in the light most favorable
> to the prosecution, any rational trier of fact could have found that
> the essential elements of the crime were proven beyond a
> reasonable doubt.**

*State v. Brown*, 3d Dist. Hancock No. 5-17-19, 2018-Ohio-899, ¶ 8, quoting *State*

*v. Plott*, 2017-Ohio-38, 80 N.E.3d 1108, ¶ 73 (3d Dist.).

Manifest Weight of the Evidence Legal Standard

{¶12} In a manifest weight analysis, "an appellate court's function * * * is

to determine whether the greater amount of credible evidence supports the verdict."

*Plott, supra*, at ¶ 73. Thus, "the appellate court sits as a 'thirteenth juror' * * *."

*State v. Davis*, 3d Dist. Seneca No. 13-16-30, 2017-Ohio-2916, ¶ 17, quoting *State*

*v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). Appellate courts

> **must review the entire record, weigh the evidence and all of the
> reasonable inferences, consider the credibility of witnesses, and
> determine whether in resolving conflicts in the evidence, the
> factfinder 'clearly lost its way and created such a manifest
> miscarriage of justice that the conviction must be reversed and a
> new trial ordered.'**

*State v. Brentlinger*, 2017-Ohio-2588, 90 N.E.3d 200, ¶ 36 (3d Dist.), quoting

*Thompkins* at 387.

{¶13} "A reviewing court must, however, allow the trier of fact appropriate

discretion on matters relating to the weight of the evidence and the credibility of the

-7-

witnesses." *State v. Sullivan*, 2017-Ohio-8937, 102 N.E.3d 86, ¶ 38 (3d Dist.), quoting *State v. Coleman*, 3d Dist. Allen No. 1-13-53, 2014-Ohio-5320, ¶ 7. "[I]t is well established that the * * * credibility of the witnesses [is] primarily a matter for the trier of fact." *State v. Gervin*, 2016-Ohio-8399, 79 N.E.3d 59, ¶ 142 (3d Dist.), quoting *State v. Clark*, 101 Ohio App.3d 389, 409, 655 N.E.2d 795 (8th Dist. 1995). "Only in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Little*, 2016-Ohio-8398, 78 N.E.3d 323, ¶ 27 (3d Dist.), quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 119.

Persistent Disorderly Conduct Legal Standard

{¶14} In order to establish that Harvey engaged in persistent disorderly conduct in violation of R.C. 2917.11(A)(2), the State had to demonstrate that Harvey "[1] recklessly [2] cause[d] inconvenience, annoyance, or alarm to another" by "[m]aking unreasonable noise or an offensively coarse utterance, gesture, or display or communicating unwarranted and grossly abusive language to any person" and [3] that he "persist[ed] in disorderly conduct after reasonable warning or request to desist." R.C. 2917.11(A)(2), (3)(a).

{¶15} The First Amendment to the United States Constitution protects the right to free speech. However, a class of speech that is not protected by the First Amendment is "fighting words." *Chaplinsky v. State of New Hampshire*, 315 U.S. 568, 573, 62 S.Ct. 766, 770, 86 L.Ed. 1031 (1942). The United States Supreme

Court has formulated a test to determine whether statements are constitutionally protected free speech or fighting words. *Id.* "The test is what men of common intelligence would understand would be words likely to cause an average addressee to fight." *Id.*

{¶16} "A person may not be punished under R.C. 2917.11(A)(2) * * * unless the words spoken are likely, by their very utterance, to inflict injury or provoke the average person to an immediate retaliatory breach of the peace." *State v. Hoffman*, 57 Ohio St.2d 129, 387 N.E.2d 239 (1978), first paragraph of the syllabus. "In determining whether this appellant's language or any other similar type language is fighting words, and as such restricted speech, one must look at the circumstances surrounding such utterance." *State v. Presley*, 81 Ohio App.3d 721, 724, 612 N.E.2d 353 (12th Dist. 1992).

{¶17} "[I]n most of the cases in which a police officer is the offended party, there is a distinction between the mere use of profane language in the presence of the police officer and when the language is directed to the officer personally." *State v. Wood*, 112 Ohio App.3d 621, 628, 679 N.E.2d 735, 740 (11th Dist. 1996). "Ohio consistently cautions that law enforcement officers must have a thicker skin than the public as a whole." *State v. Beamer*, 5th Dist. Coshocton No. 11CA14, 2012-Ohio-2222, ¶ 18. However, "[t]o tell anyone, including a police officer, "f[***] you," either verbally or via an extended digit, may indeed constitute fighting words, depending on the circumstances." *Wood* at 628. In other circumstances, "[s]uch

-9-

language, although crude, merely reflects a general commentary about the situation and not a direct attack on the officers." *Id*. at 629. Generally, however, "something more than mere profanity is required to constitute fighting words." *City of Chillicothe v. Lowery*, 4th Dist. Ross No. 97 CA 2331, 1998 WL 396316, *7 (July 13, 1998).

{¶18} In determining whether profane utterances constitute fighting words, courts have considered whether the conduct accompanying these statements is hostile or threatening. *See Brooks v. City of West Point, Miss.*, 639 Fed.Appx. 986, 997 (5th Cir. 2016) (finding the defendant's statements were not accompanied by "any overt hostile act, conduct or gesture" and were, therefore, not fighting words.); *U.S. v. Poocha*, 259 F.3d 1077 (9th Cir. 2001) (considering the defendant's words in addition to "his hostile and defiant expressive conduct * * *."); *State v. Rossiter*, 4th Dist. Ross No. 96 CA 2202, 1997 WL 147532, *9 (Mar. 26, 1997) (finding statements were fighting words because the "appellant combined his words with actions when he swung at" a police officer.); *City of Shaker Heights v. Marcus*, 8th Dist. Cuyahoga No. 61801, 1993 WL 27676, *3 (Feb. 4, 1993) (considering the defendant's "words * * * in the context of [his] actions" that included "getting in [the police officer's] face and slamming his fist upon [a] desk."); *City of Kent v. Dawson*, 11th Dist. Portage No. 2000-P-0094, 2001 WL 637475, *2 (June 8, 2001) (holding the defendant's "language and conduct constituted fighting words.").

{¶19} Courts, in determining whether offensive statements are fighting words, have also considered whether the defendant has repeated profane statements directed at a police officer after the defendant has been ordered to stop. *State v. Semple*, 58 Ohio App.3d 93, 93, 568 N.E.2d 750 (1st Dist. 1989); *City of Cleveland v. Smith*, 8th Dist. Cuyahoga No. 62560, 1993 WL 437661, *3 (Oct. 28, 1993) (holding "constitutionally unprotected "fighting words" have been found where the defendant repeatedly directs to the police profane epithets which would provoke the average person to a breach of the peace."); *City of Eastlake v. Kirkpatrick*, 11th Dist. Lake No. 2007-L-064, 2007-Ohio-6945, ¶ 24, citing *Wood, supra*, at 628.

Sufficiency of the Evidence Analysis

{¶20} In the first argument in his sufficiency of the evidence challenge, Harvey uses several case illustrations to argue that offensive language uttered at a police officer does not constitute disorderly conduct because such statements are not fighting words. *State v. Robison*, 83 Ohio App.3d 337, 338, 614 N.E.2d 1109, 1110 (11th Dist. 1992); *State v. Lamm*, 80 Ohio App.3d 510, 609 N.E.2d 1286 (4th Dist. 1993); *State v. Maxson*, 66 Ohio App.3d 32, 583 N.E.2d 402 (1st Dist. 1990). We will consider these case illustrations in turn.

{¶21} Harvey cites *State v. Robison* to argue that profane language that is uttered at the police does not constitute threatening behavior. *Robison* at 337. In *Robison*, the police went to a house in response to a call. *Id*. At the house, Robison refused to come outside and yelled profanities at the police. *Robison* at 338.

-11-

Robison was then arrested and charged with a violation of Warren Codified Ordinance 509.03.[2] *Id.* at 339. Under this provision, the State had to prove that the defendant "threaten[ed] harm to persons or property." *Id.* at 339. The Eleventh District determined that this was a "borderline situation" and that the State did not produce any evidence "regarding the element of 'harm.'" *Id.* at 338-339. Thus, the appellate court reversed Robison's conviction for disorderly conduct. *Id.* at 339.

{¶22} Even if Robison had been charged under R.C. 2917.11(A)(2), the case before this Court is still distinguishable.[3] In *Robison*, the Eleventh District held that "under most circumstances, cursing at an officer does not *in and of itself* constitute disorderly conduct * * *." (Emphasis added.) *Robison* at 339. Further, the State did not establish that Robison "engage[d] in any *threatening conduct* or ma[d]e any overt threats against the complaining officer." (Emphasis added.) *State v. Imperatore*, 9th Dist. Medina No. 2354-M, 1995 WL 256176, *2 (May 3, 1995) (distinguishing *Robison* from the case before that court).

{¶23} In the case before this Court, Harvey did not merely utter obscenities at the police. His profanity was accompanied by threatening conduct. Harvey refused to remove his hands from his pockets, gripped his key as though it were a

---

[2] Warren Codified Ordinance 509.03 reads the same as R.C. 2917.11(A)(1). Harvey, however, was charged with a violation of R.C. 2917.11(A)(2).

[3] We note that courts have held that a defendant's refusal to show his or her hands to the police, after being ordered to do so, is disorderly conduct under R.C. 2917.11(A)(1). *City of Garfield Heights v. Timoneri*, 8th Dist. Cuyahoga No. 67085, 1994 WL 723705, *3 (Dec. 29, 1994); *State v. Cookingham*, 11th Dist. Ashtabula No. 2017-A-0023, 2017-Ohio-8362, ¶¶ 4, 26. However, in the case before this Court, the State charged Harvey with a violation of R.C. 2917.11(A)(2). Thus, in our analysis, we will consider whether the State established a violation of R.C. 2911.17(A)(2).

"stabbing weapon," and refused to drop the key when ordered to do so. Tr. 187. The police testified at trial that this key could have been used as a weapon. Tr. 168, 200. Further, the record indicates that the police did not move to arrest Harvey until after he was warned multiple times to remove his hands from his pockets and refused to do so. Tr. 101.

{¶24} The testimony of the police officers indicates that Harvey's conduct alongside his profane utterances and aggressive demeanor were the impetus for the police to arrest him for disorderly conduct. Tr. 101. Officer Wheeler stated:

> **He [Harvey] wouldn't take his hands out of his pockets. He—he's like 'don't F'ing touch me.'**
>
> **So at this point, our main concern was; one, what's in his hands? We can't see what's in his pockets. At this point he's under arrest. So we struggled to get, you know, his hands out from inside of his pockets.**

Tr. 101. Thus, the police did not act to arrest Harvey for disorderly conduct simply because Harvey was uttering obscenities at them. The police only acted to arrest him after he refused to take his hands out of his pockets. Tr. 101.

{¶25} Harvey next cites *State v. Lamm* and *State v. Maxson* to argue that the State failed to establish that his statements constituted fighting words. *Lamm, supra*, at 510. *Maxon, supra*, at 404. In *Lamm*, the defendant was speeding. *Lamm, supra*, at 512. After the defendant had parked and exited his car, a police officer approached him. *Id.* Lamm responded by yelling profanity at the police and

continued to do so after being warned to stop by the police officer. *Id*. At trial, the police officer testified as follows:

> **Q. At no time during this entire night did you, none of what Keith said moved you to fight did it?**
>
> **[Police Officer:] It wasn't what he said that would, would cause an altercation, it was his resistance *after the point of arrest*.**
>
> **Q. Well, we're not here about what happened after the arrest. What I'm asking you is based on your training and experience as a police officer. What Keith Lamm was saying to you really did not upset you at all did it?**
>
> **[Police Officer:] I've been called those names before sir.**
>
> **Q. Okay. And it's something that you just let it roll off your back, you just go along, you just go do your job, isn't that correct?**
>
> **[Police Officer:] I usually make an arrest in those events, but yes, that, that doesn't bother me. I don't lose any sleep over it.**

(Emphasis added.) *Id*. at 514. The Fourth District held that Lamm's statements did not constitute fighting words. *Id*. at 515.

{¶26} In *Maxson*, a police officer was writing a citation for an illegally parked vehicle. *Maxson*, *supra*, at 35. Maxson yelled multiple profane statements at the officer. *Id*. Maxon was told multiple times to refrain from uttering obscene statements. *Id*. On appeal, the First District reversed Maxon's conviction for disorderly conduct, determining that the State did not establish that Maxon's statements were "likely to provoke the average person to an immediate retaliatory breach of their peace." *Id*. at 34.

-14-

{¶27} In the case before this Court, Officer Wheeler testified that Harvey was yelling "let me see an F'ing search warrant", "F you guys", "this is a declaration of war", and "this means war." Tr. 97. He further testified that he has "been called very, very horrific things that [he has] * * * not arrested individuals for because it doesn't bother me." Tr. 114. Officer Wheeler first pointed to the fact that Harvey was yelling obscenities in the middle of the street. Tr. 118. Officer Wheeler then testified that Harvey ultimately "was not arrested for those statements alone." Tr. 116. These statements were accompanied by Harvey being "aggressive at that point with what he was saying, the way his body posture was, putting his hands—how he was saying the things he was saying." Tr. 104-105. Officer Wheeler also testified that he was also concerned when Harvey put his hands in his pockets because the people who lived across the street were "interconnected" with Mullett. Tr. 100.

{¶28} Lt. Elliott similarly testified that he did not "personally find [Harvey's] language offensive." Tr. 153. He stated that hearing the phrase "this is a declaration of war," put the police "obviously * * * a lot more on high alert than we already [were]." Tr. 100. However, Lt. Elliott testified that Harvey's "actions and shoving his hands in his pockets would make me believe that he had a weapon, which is why we made contact with him and grabbed his arms." Tr. 155. He also noted that Harvey was yelling obscenities "in the middle of the street." Tr. 153-154.

{¶29} Lt. Harris also testified as followed:

**[Prosecutor]: Then again before the arrest began, did you hear any of the specific statements Mr. Harvey said?**

**[Lt. Harris]: He made a declaration—I believe he said 'an act of war.' At that point he puts his hands in his pockets.**

Tr. 182. Lt. Harris stated that Harvey's "tone of voice sounded angry." Tr. 189.

{¶30} The testimony at trial indicates that Harvey was "aggressive," "agitated," and "angry." Tr. 104, 136, 189. Further, he was screaming about an "act of war" and a "declaration of war" in conjunction with putting his hands into his pockets. Tr. 100-101. The act of putting his hands into his pockets led the police to believe that Harvey may have had a weapon. Tr. 101. Because Harvey did not simply utter profane language in the presence of the police, we find *Lamm* and *Maxson* to be distinguishable from the case before us.

{¶31} Second, Harvey cites *State v. Miller* to argue that a defendant's actions do not amount to disorderly conduct "when [a police officer is] affected in his official, and not personal, needs and comfort * * *." *State v. Miller*, 67 Ohio App.2d 127, 128, 426 N.E.2d 497, 498 (3d Dist. 1980). In *Miller*, a police officer came upon the defendant ("Miller") wrestling with another man. *Id*. The two men "immediately stopped" wrestling when the police officer arrived on the scene. *Id*. Miller "was charged with inconveniencing [the police officer]." *Id*. However, during his trial testimony, the police officer affirmed that Miller "caused [him] absolutely no trouble * * *." *Id*. This Court concluded that this "altercation created not an inconvenience [for the police officer], but a job." *Id*.

{¶32} We conclude that *Miller* is distinguishable from the case before us. In *Miller*, the defendant's conduct was "directed toward another party," not the police officer. *State v. Freewalt*, 3d Dist. Auglaize No. 2-87-11, 1988 WL 72400, *3 (June 30, 1988) (holding "that simply because a police officer must routinely expect to encounter the language or conduct proscribed in R.C. 2917.11 in the course of performing his job, such conduct or language is not actionable as to him under that statute."). Further, the police officer testified at trial that Miller caused him "absolutely no trouble." *Miller* at 128. Thus, this Court held that Miller's conduct was not "actionable *as to* the [police officer] * * *." (Emphasis added.) *Freewalt* at *3. By contrast, Harvey's conduct was directed at the police. The police testified at trial that Harvey's behavior was "aggressive" and that he appeared "agitated." Tr. 104, 136. The police also testified that Harvey did not comply with orders and yelled at them. Tr. 97, 102, 119, 135-136.

{¶33} In the end, the State, at trial, presented evidence that Harvey approached the police in an aggressive and agitated manner. Tr. 104. He was yelling profanity in the middle of the street that was directed at the police officers. Tr. 101, 118, 136. Then, as he was yelling that the police officers' actions were a "declaration of war" and an "act of war," Harvey put his hands into his pockets. Tr. 97, 100, 136, 182. These actions, in conjunction with each other, led the police to be concerned that Harvey may have had a weapon and prompted the police to arrest Harvey. Tr. 101. The testimony at trial further indicates that the police ordered

Harvey multiple times to take his hands out of his pockets and that Harvey refused to comply with these orders. Tr. 101, 119, 138. Under these specific circumstances, we conclude that Harvey's statements constitute fighting words. Thus, after reviewing this evidence in a light most favorable to the prosecution, we conclude that Harvey's conviction for disorderly conduct is supported by sufficient evidence.

Manifest Weight Analysis

{¶34} Harvey also argues that his conviction is against the manifest weight of the evidence because Donna and Misty's testimony contradicted the police officers' testimony. At trial, Donna testified that she went outside because she wanted to check on Mullett's dogs. Tr. 223. She stated that she was "spazzing out" and "yelling." Tr. 224. She said that Harvey did not make any profane statements towards the police or behave aggressively towards them, though she did admit that she behaved aggressively towards the police. Tr. 223.

{¶35} Misty testified that Harvey did not swear at the police officers and "politely" asked them if they had a warrant. However, she did say that Donna was yelling obscene language at the police officers. Tr. 236. She stated that the police grabbed Harvey as he turned away from them. Tr. 237. She remembered hearing the police order Harvey to drop his key. Tr. 240. She also testified that she had "no relationship" with Harvey prior to the day of this incident. Tr. 240.

{¶36} Further, Harvey testified that he approached the police officers and asked "may I please see an arrest warrant[?]" He also testified that the police

officers were "lying." Tr. 269. He denied ever behaving belligerently or directing profane language towards the police officers. Tr. 269. He did, however, admit to putting his hands in his pockets. Tr. 269.

{¶37} In this case, there is conflicting testimony as to what happened. "However, a conviction is not against the manifest weight of the evidence simply because the testimony presented at trial is in conflict and the jurors chose to believe the State's witnesses." *State v. Garey*, 3d Dist. Auglaize No. 2-19-03, 2019-Ohio-4525, ¶ 17. After reviewing the evidence in the record, we do not find any indication that the jury lost its way and returned a verdict that was against the manifest weight of the evidence. For these reasons, Harvey's first assignment of error is overruled.

*Second Assignment of Error*

{¶38} In this assignment of error, Harvey first argues that his conviction for resisting arrest is not supported by sufficient evidence because he was not lawfully arrested. He then argues that his conviction is against the manifest weight of the evidence because some of the testimony presented at trial suggests that he did not physically resist his arrest.

Legal Standard

{¶39} We herein reincorporate the sufficiency of the evidence and manifest weight standards set forth under Harvey's first assignment of error. In order to establish that Harvey resisted arrest in violation of R.C. 2921.33(A), the State had to demonstrate that Harvey "[1] recklessly or by force, [2] * * * resist[ed] or

-19-

interfere[d] [3] with a lawful arrest * * *." R.C. 2921.33(A). "Under the plain language of R.C. 2921.33(A), the arrest must be lawful in order to be convicted of the crime of resisting arrest." *State v. Nye*, 3d Dist. Seneca Nos. 13-97-18 and 13-97-19, 1997 WL 762824, *2 (Dec. 12, 1997). "An arrest is "lawful" if under the surrounding circumstances, the police officer had a reasonable basis or probable cause to believe that an offense has been committed." *Id.*

*Sufficiency of the Evidence Analysis*

{¶40} Harvey argues that his arrest was not lawful because he did not commit the offense of persistent disorderly conduct. To support this assertion, he largely reiterates the arguments that he made in his first assignment of error. For several reasons, we find that Harvey's conviction for resisting arrest is supported by sufficient evidence. First, we determined that the arguments in his first assignment of error were without merit and found that his conviction for persistent disorderly conduct was supported by sufficient evidence. In other words, we concluded that the State was able to present some evidence at trial that established that Harvey committed the offense of persistent disorderly conduct in the presence of the police.

{¶41} Second, the State presented evidence that persistent disorderly conduct was an arrestable offense. Officer Wheeler testified that the police are authorized to make an arrest for persistent disorderly conduct. Tr. 93. Further, Lt. Elliott testified that the police do not make arrests for disorderly conduct but do

make arrests for persistent disorderly conduct. Tr. 153.[4] Third, Lt. Elliott also testified that he believed, at the time of the arrest, that Harvey was engaged in persistent disorderly conduct. Tr. 153.

**{¶42}** This evidence demonstrates that the police had "a reasonable basis or probable cause to believe that an offense has been committed." *Nye, supra*, at *2. After reviewing the evidence in a light most favorable to the prosecution, we conclude that there was some evidence presented at trial that substantiates the element of lawful arrest. Thus, Harvey's conviction for resisting arrest is supported by sufficient evidence.

*Manifest Weight Analysis*

**{¶43}** Harvey argues that, even if his arrest was lawful, he did not resist his arrest. To support this argument, he points to the testimony of Misty and Donna. Misty testified that the police "grabbed" Harvey. Tr. 237. Similarly, Donna stated that the police officers "came up behind us and grabbed [Harvey] * * *." Tr. 219. Donna testified that she did not see Harvey use the key in his hand as a weapon or swing this key at the police officers. Tr. 227. She also characterized the police officers' treatment of Harvey as "assault." Tr. 226.

---

[4] While disorderly conduct is a minor misdemeanor, persistent disorderly conduct is a fourth degree misdemeanor. R.C. 2917.11(E)(3)(a). A "[v]iolation of a minor misdemeanor ordinarily is not an arrestable offense." *State v. Ewing*, 10th Dist. Franklin No. 09-AP-776, 2010-Ohio-1385, ¶ 28, citing R.C. 2935.26 (stating the general rule that police officers should issue citations for minor misdemeanors rather than make an arrest). Thus, this testimony is evidence that supports the lawful arrest element of resisting arrest.

{¶44} Harvey testified that he did not resist arrest. He stated that the police did not give him a chance to take his hands out of his pocket and that the police did not tell him that he was under arrest. Tr. 257. He denied fighting with the officers or "swing[ing] at them." Tr. 256. He also stated that he could not release his keys from his hands because his "hands were being held closed" by the police. Tr. 258, 270-271. He said that the police "did not give [him] time to respond * * *" to their orders. Tr. 270.

{¶45} At trial, however, Officer Wheeler testified that Harvey "wouldn't take his hands out of his pockets" after Lt. Elliott informed Harvey that he was under arrest. Tr. 101. Harvey, at this point, told the officers "don't F'ing touch me." Tr. 101. Officer Wheeler stated that he "struggled" with Harvey to get his hands out of his pockets and that the police had to "take [Harvey] to the ground" because this would enable him to "get better control over" him. Tr. 102. He also stated that the officers repeatedly told Harvey to "stop resisting, place your hands behind your back, you're under arrest." Tr. 102. Officer Wheeler stated that officers ultimately had to use a taser in order to get the keys out of Harvey's hands and to put him in handcuffs. Tr. 103.

{¶46} Lt. Harris testified that "Lieutenant Elliott and Officer Wheeler were going to conduct an arrest on [Harvey]. He was being, at that point, not necessarily combative, but * * * at that point they actually picked [Harvey] up and [were] walking with him, that turned more aggressive, he was pushing, pulling away,

resisting." Tr. 181. He stated that Harvey was "actively pulling away from me when he's under arrest" and that Harvey would "not give me his hands." Tr. 183. Lt. Harris stated that "pressure points and joint manipulation" were ineffective at getting Harvey into handcuffs. Lt. Harris testified that the police had to use a taser "to release the key out of [Harvey's] hand" and to "place[] him in handcuffs behind his back." Tr. 188.

{¶47} Again, the fact that there is conflicting testimony presented at trial does not establish that a conviction is against the manifest weight of the evidence. *State v. Dendinger*, 3d Dist. Seneca No. 13-18-38, 2019-Ohio-2158, ¶ 21. "The finder of fact is free to believe all, some, or none of the testimony of each witness appearing before it." *State v. Houdeshell*, 3d Dist. Hancock No. 5-18-02, 2018-Ohio-5217, ¶ 39. After examining the evidence in the record, we do not find any indication that the jurors lost their way and returned a verdict that was against the manifest weight of the evidence. Harvey's second assignment of error is overruled.

*Third Assignment of Error*

{¶48} Harvey argues that the trial court erred by admitting video evidence that he alleges should have been excluded pursuant to the trial court's ruling on the State's motion in limine of April 30, 2019.

Legal Standard

{¶49} A motion in limine "serves the useful purpose of raising and pointing out before trial, certain evidentiary rulings that the Court may be called upon to

-23-

make." *State v. Maurer*, 15 Ohio St.3d 239, 259, 473 N.E.2d 768, 787 (1984). "A ruling on a motion in limine reflects the court's anticipated treatment of an evidentiary issue at trial and, as such, is a tentative, interlocutory, precautionary ruling." *State v. French*, 72 Ohio St.3d 446, 650 N.E.2d 887 (1995). "It is not a ruling on evidence * * * [but] adds a procedural step prior to the offer of evidence." *Maurer* at 259.

{¶50} "In deciding such motions, the trial court is at liberty to change its ruling on the disputed evidence in its actual context at trial. Finality does not attach when the motion is granted." *City of Defiance v. Kretz*, 60 Ohio St.3d 1, 4, 573 N.E.2d 32, 35 (1991). "Finality does not attach to the court's ruling until the trial court makes its final determination as to the admissibility of the evidence at trial." *Kinn v. HCR ManorCare*, 2013-Ohio-4086, 998 N.E.2d 852, ¶ 44 (6th Dist.), citing *State v. Grubb*, 28 Ohio St.3d 199, 202, 503 N.E.2d 142 (1986).

{¶51} Further, "[u]nder the invited-error doctrine, 'a party is not entitled to take advantage of an error that he himself invited or induced the court to make.'" *State v. Jackson*, 149 Ohio St.3d 55, 2016-Ohio-5488, 73 N.E.3d 414, ¶ 108, quoting *State ex rel. Kline v. Carroll*, 96 Ohio St.3d 404, 2002-Ohio-4849, 775 N.E.2d 517, ¶ 27. "[I]t is invited error when a party asks a court to take some action later claimed to be erroneous." *State v. Harper*, 3d Dist. Allen No. 1-05-79, 2007-Ohio-109, ¶ 20. "A stipulation is a voluntary agreement between opposing counsel concerning disposition of some relevant point so as to obviate the need for proof or to narrow

the range of litigable issues." *State v. Easterling*, 2d Dist. 2019-Ohio-2470, ---

N.E.3d ---, ¶ 66 (2d Dist.), quoting 89 Ohio Jurisprudence 3d, Trial § 60. "Pursuant

to [the] doctrine [of invited error], a party cannot claim that a trial court erred by

accepting the party's own stipulation." *State v. Richey*, 2018-Ohio-3498, 118

N.E.3d 1147, ¶ 61 (10th Dist.), quoting *State v. McClendon*, 10th Dist. Franklin No.

11AP-354, 2011-Ohio-6235, ¶ 37.

Legal Analysis

{¶52} On April 30, 2019, the State filed a motion in limine that sought to

prohibit the Defense from "making any argument in reference to * * * events

occurring after the Defendant was arrested and placed in the ambulance." Doc. 32.

In particular, this motion addressed video footage of Harvey's ambulance ride from

Adams Street to the hospital. Tr. 11. The State wanted the footage from the

ambulance ride excluded, but Harvey wanted this footage admitted. Tr. 11. The

following discussion occurred just prior to trial:

> **[Court]: The motion in limine regarding the evidence presented, or the fact presented after the arrest, is that anything you want to talk about now?**
>
> **\* \* \***
>
> **[Prosecutor]: Basically that the three charges before the Court today all occur prior to the Defendant's arrest and transport in the ambulance. There's very little probative value, if anything, that occurs after the Defendant's placement in the ambulance and transport to the hospital. And then sitting at the hospital, interacting with the officers and the nurses, any probative value is significantly outweighed by undue delay considerations, and the**

**whole crux of the case * * * occurs prior to the transport in the ambulance, so there's no reason to bring that in. Thank you, Your Honor.**

**\* \* \***

**[Defense Counsel]: Your Honor, my client would like to play other portions of the video. It goes to show the mindstate [sic] of the officers, that they were behaving unprofessionally that day, and it would show that they had tended to behave unprofessionally earlier in the day by arresting my client for exercising his First Amendment right to free speech, Your Honor. There are statements made that are using profane language, telling my client to shut up, and other things of that nature. And, you know, it's just gonna go to show that he didn't do the things that he did earlier. They were making things up in cahoots to make these charges stick because he was an African American male, Your Honor.**

**[The Court]: * * * I'm gonna tentatively rule on [the motion in limine]. * * * [T]here won't be any evidence brought in after the arrest. But I will listen to objections as we proceed through the trial. If I believe that the evidence should come in after the arrest, then I may change that tentative decision.**

Tr. 11. At trial, Harvey did not proffer the video footage of the ambulance ride.

{¶53} However, the State did introduce a seven-minute video recording from Officer Guerkink's body camera ("Joint Exhibit One"). Tr. 143, 304. Ex. 1. This video was admitted pursuant to the stipulation of both parties. Tr. 5, 247. Joint Exhibit One included roughly two and a half minutes of footage from after Harvey had been arrested and before he went into the ambulance. Ex. 1. While the record does not indicate that this two and a half minutes of footage was played at trial, this footage was on the disc that was admitted into evidence and given to the jury for its

deliberations. Ex. 1. On appeal, Harvey argues that this footage was admitted in violation of the trial court's ruling on the State's motion in limine.

{¶54} In this case, the wording of the State's motion in limine specifically addresses the "events occurring after the Defendant was arrested *and* placed in the ambulance." (Emphasis added.) Doc. 32. The discussion before the trial court also indicates that this motion in limine was directed at the video footage of Harvey's ambulance ride to the hospital. Further, immediately preceding the trial court's ruling on the State's motion in limine, the parties discussed the admission of Joint Exhibit One as a matter that was separate and distinct from the State's motion in limine. Tr. 5. Joint Exhibit One was admitted into evidence by the stipulation of both parties prior to the parties' discussion of the State's motion in limine. Tr. 5. Thus, contrary to Harvey's argument, the evidence in the record indicates that the admission of Joint Exhibit One was not inconsistent with the trial court's decision regarding the State's motion in limine.

{¶55} While Harvey opposed the State's motion in limine before the trial court, he stipulated to the admission of Joint Exhibit One. Thus, even if the trial court erred by admitting this evidence, this was an error that Harvey invited. The doctrine of invited error does not permit Harvey to stipulate to the admission of Joint Exhibit One at trial and then argue the trial court erred in admitting Joint Exhibit One on appeal. *See State v. Kasler*, 5th Dist. Fairfield No. 11-CA-59, 2012-Ohio-6073, ¶ 87 (concluding that it was invited error for the defendant to argue on appeal

that the trial court erred by admitting an exhibit that was stipulated to by the Defense at trial). Thus, Harvey's third assignment of error is overruled.

*Fourth Assignment of Error*

**{¶56}** Harvey argues that he was denied his right to the effective assistance of counsel because his attorney failed to object to the admission of evidence on four separate occasions.

Legal Standard

**{¶57}** "Under Ohio law, 'a properly licensed attorney is presumed to carry out his duties in a competent manner.'" *Beaver, supra*, at ¶ 26, quoting *State v. Gee*, 3d Dist. Putnam No. 12-92-9, 1993 WL 270995 (July 22, 1993). For this reason, the appellant has the burden of proving that he or she was denied the right to the effective assistance of counsel. *Brown, supra*, at ¶ 42. "In order to prove an ineffective assistance of counsel claim, the appellant must carry the burden of establishing (1) that his or her counsel's performance was deficient and (2) that this deficient performance prejudiced the defendant." *State v. McWay*, 3d Dist. Allen No. 1-17-42, 2018-Ohio-3618, ¶ 24, quoting *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

**{¶58}** In order to establish deficient performance, the appellant must demonstrate that trial "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *State v. Howton*, 3d Dist. Allen No. 1-16-35, 2017-Ohio-4349, ¶ 35, quoting

-28-

*Strickland* at 687. "Tactical or strategic trial decisions, even if unsuccessful, do not generally constitute ineffective assistance." *State v. Harrison*, 2015-Ohio-1419, 31 N.E.3d 220, ¶ 75 (3d Dist.). "[T]rial counsel's failure to object is generally viewed as trial strategy and does not establish ineffective assistance." *State v. Turks*, 3d Dist. Allen No. 1-08-44, 2009-Ohio-1837, ¶ 43. "Counsel need not raise meritless issues or even all arguably meritorious issues." *State v. Mayse*, 88 N.E.3d 1208, 2017-Ohio-1483, ¶ 24 (3d Dist.).

**{¶59}** In order to establish prejudice, "the defendant must show a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *Davis, supra*, at ¶ 36, quoting *State v. Bibbs*, 3d Dist. Hancock No. 5-16-11, 2016-Ohio-8396, ¶ 13. If the appellant does not establish one of these two prongs, the appellate court does not need to consider the facts of the case under the other prong of the test. *State v. Baker*, 3d Dist. Allen No. 1-17-61, 2018-Ohio-3431, ¶ 19, citing *State v. Walker*, 2016-Ohio-3499, 66 N.E.3d 349, ¶ 20 (3d Dist.).

Legal Analysis

**{¶60}** *Failure to Object to Joint Exhibit One*: Harvey argues that his trial counsel should have objected to the admission of the portion of Joint Exhibit One that contained footage of Harvey after his arrest. Harvey has not demonstrated that the admission of Joint Exhibit One was improper or how an objection to the admission of this evidence would have changed the outcome of his trial. *See State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, ¶ 231.

{¶61} *Failure to Object to Officer Wheeler's Statements*: At trial, Lt. Harris stated that the people who live at 841 Adams Street "frequently travel from house to house" and that the houses in this area were "interconnected." Tr. 100. Harvey argues that his trial counsel should have objected to these statements because they were hearsay. However, Harvey has not even demonstrated that these statements were hearsay. *See Beaver, supra*, at ¶ 33. Further, Harvey has not advanced any argument as to how he would have been acquitted in the absence of these statements. *See State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 103.

{¶62} *Failure to Object to Lt. Harris's Statements*: At trial, Lt. Harris stated that he knew, from his prior police activities, that the individuals who lived at 841 Adams Street and at 848 Adams Street were connected. Tr. 184. While Harvey argues that his trial counsel should have objected to this statements, he has not demonstrated that these statements were improperly admitted. *See Beaver* at ¶ 33. He also has not demonstrated how he would have been acquitted in the absence of these statements. *See Conway* at ¶ 103.

{¶63} *Failure to Object to Lt. Elliott's Statements*: At trial, the State introduced Joint Exhibit One and questioned Lt. Elliott about this video recording's contents. After the jury had viewed the video footage of Harvey's arrest, Lt. Elliott and the prosecution engaged in the following colloquy:

> **Prosecutor: Was everything that happened up to [the] point [of arrest] that day the basis for your three charges?**

**[Elliott]: Yes.**

**[Prosecutor]: So there's nothing that happened afterwards [after the arrest] on which you based a charge?**

**[Elliott]: He continued to refuse to tell us who he was.**

Tr. 150. In his brief, Harvey has not advanced an argument that demonstrates how he would have been acquitted in the absence of this statement.

{¶64} Harvey has not demonstrated, in these four arguments, how different actions by his trial counsel in these situations would have changed the outcome of his trial. Thus, Harvey has not carried the burden of establishing that he did not receive the effective assistance of counsel at trial. For these reasons, his fourth assignment of error is overruled.

*Conclusion*

{¶65} Having found no error prejudicial to the appellant in the particulars assigned and argued, the judgment of Municipal Court of Marion County is affirmed.

*Judgment Affirmed*

**SHAW, P.J. and PRESTON, J., concur.**

**/hls**