[Cite as *State v. Hagwood*, 2023-Ohio-3970.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,          :

                                No. 112065

    v.                                 :

JERMAINE HAGWOOD,                       :

    Defendant-Appellant.         :

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** November 2, 2023

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-22-669261-C

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Brad Meyer, Assistant Prosecuting
Attorney, *for appellee.*

Erin R. Flanagan, *for appellant.*

FRANK DANIEL CELEBREZZE, III, J.:

{¶ 1} Defendant-appellant Jermaine Hagwood appeals his convictions and

sentence for aggravated robbery, kidnapping, felonious assault, and having a

weapon while under disability. Hagwood contends that his convictions were against

the manifest weight of the evidence and that his sentence violated his constitutional

right protecting him against cruel and unusual punishment. After a thorough review of the record and law, we affirm.

## I. Factual and Procedural History

{¶ 2} A Cuyahoga County Grand Jury charged Hagwood and codefendants Jada Hite ("Hite")[1] and Tamara McLoyd ("McLoyd")[2] in a 21-count indictment detailing numerous incidents that occurred in November and December 2021.

{¶ 3} The charges that included Hagwood were aggravated robbery in violation of R.C. 2911.01(A)(1) (Counts 1, 2, 5, 8, 9, 14, 16, and 19); kidnapping in violation of R.C. 2905.01(A)(2) (Counts 3, 6, and 17); felonious assault in violation of R.C. 2903.11(A)(2) (Counts 4 and 7); and having weapons while under disability in violation of R.C. 2923.13(A)(2) (Counts 12, 15, 18, and 20). All charges included four firearm specifications: a one-year specification; an 18-month specification; a three-year specification; and a 54-month specification. All three defendants were tried jointly where the following facts were elicited relating to each incident.

{¶ 4} Count 1 stemmed from an incident that occurred on November 2, 2021, in Lakewood, Ohio. The victim, Natalie Pape, left her boyfriend's home around 9 p.m. on foot. She testified that sometime between 9 p.m. and 9:30 p.m., she was robbed at gunpoint by a male and female wearing dark clothes and black medical masks. Pape felt an object aggressively pressed against her back and chest that she

---

[1] As of the date of this decision, codefendant Hite has not filed a notice of appeal in this court.

[2] McLoyd has also appealed her convictions and sentence to this court in *State v. McLoyd*, 8th Dist. Cuyahoga No. 112107, named a companion to the instant appeal.

presumed was a gun. The offenders took her purse from her shoulder and ran off. Later that evening, Pape received an email from her debit card company indicating that a transaction was declined due to insufficient funds. The declined transaction was an attempted transfer of funds to a CashApp account belonging to Hite, whom she did not know or give permission to use her debit card.

{¶ 5} Counts 2, 3, 4, 5, 6, 7, and 8 stemmed from an incident that occurred a few miles away from the Pape robbery, approximately 20 minutes later at Happy's Pizza in Cleveland, Ohio. Tanika Ghivens[3] ("Ghivens"), a delivery driver, and Sherri Gurka ("Gurka"), a cook, were performing closing duties when three offenders entered through the back door, which was left open. Two of the offenders displayed guns and demanded that Gurka open the cash register. When Gurka informed them that she could not open the register because she was a cook, she was struck in the head with a handgun. Gurka told officers at the time of the incident that the offender who held a gun to her back and struck her in the head was likely male based on the timbre of the voice, but at trial, she testified that she was not confident that the offender was male. Ghivens testified that one of the offenders who she believed was a male placed a firearm on her chest and struck her with the firearm in the head at least once. She knew this because "he was masculine, he was aggressive. He was more aggressive than the other two." (Tr. 771.) Ghivens eventually opened the cash register and handed the defendants about $200 to $300 in cash. The offenders then

---

[3] In the indictment and jury instructions, this victim was also referred to as "Tinika L. Givhan." For consistency, the victim will be referred to as "Ghivens" throughout, based on how the victim spelled her name during trial.

held both Gurka and Ghivens at gunpoint and demanded that they proceed to a back room, where the offenders erroneously believed there would be a safe with more cash. There was not, and both victims testified that they were further struck with handguns. The alleged male offender also forcibly reached into Ghivens's pockets and waistband, and stole an inoperable gun that Happy's Pizza supplied to delivery drivers for safety when making deliveries in high crime areas. Gurka was robbed of her car and house keys, which were on her person.

{¶ 6} Counts 9 and 12 pertain to an incident occurring in Cleveland Heights, Ohio, also on November 2, 2021, at around 11:50 p.m. The victim, Peggy Lyons ("Lyons"), was walking home from a CVS convenience store when she was robbed at gunpoint. Lyons testified that a male and female wearing all black including black masks "came up close and casually said, 'we're going to take your purse[.]'" (Tr. 720.) She felt something against her back and then the female told Lyons to "give him your purse or he'll shoot you" and then placed a gun on her chest. (Tr. 720-721.) Lyons handed over her purse and observed the offenders retreat to a waiting vehicle. Since her phone was taken with her purse, Lyons was not able to immediately call the police but flagged down a police car that happened to be driving around the corner, and pointed out the vehicle that the offenders retreated to after robbing her. That officer, Michael Dugan ("Ofc. Dugan") of the Cleveland Heights Police Department, testified that he attempted to stop the vehicle, a dark-colored Nissan sedan, but it did not stop, so he engaged the vehicle in a high-speed chase.

Before he was able to stop the vehicle, his officer-in-charge terminated the pursuit, erroneously believing that the crime was nonviolent.

{¶ 7} Lyons's robbery was assigned to Detective William Robinson ("Det. Robinson") of the Cleveland Heights Police Department. Det. Robinson reached out to the Cleveland Police Department to compare notes regarding additional robberies that occurred in Northeast Ohio, especially involving a dark-colored Nissan sedan like the one that Ofc. Dugan engaged in the chase. At the time he began investigating, Det. Robinson discovered that the Cleveland Police Department already had the Nissan in custody, and received items recovered from the Nissan including an insurance card bearing Lyons's name as well as an envelope bearing her name that she confirmed to Det. Robinson and again at trial, were in her purse on the evening she was robbed. Additionally, Det. Robinson learned that Lyons's PNC credit card was used to pay a Dominion Energy bill in the name of Jerelle Harkness's ("Harkness") minor child. Det. Robinson questioned Harkness regarding this bill, and she indicated that she was previously in a romantic relationship and living with Hagwood, whom she surmised paid the bill online using Lyons's credit card.

{¶ 8} Counts 14 and 15 pertain to an incident that occurred on November 4, 2021, in Lakewood, Ohio. The victim, Christina Watters ("Watters"), was returning home from work around 9:30 p.m. She parked her car on the street near her apartment building and began walking, holding various items including a bottle of wine that she had just purchased. Watters testified that as she was walking across

the street to her apartment, she noticed a running car parked in a driveway and walked around it. As she walked around the parked car, two people wearing dark colored clothing and masks came from behind and grabbed her. Watters was not able to confirm the gender of either of the offenders but testified that a gun was pointed at her hip and she engaged the offenders by asking what they wanted and, in an attempt to humanize herself, asked them not to take her bottle of wine. Watters was not carrying a purse but testified that she was "carrying" her car keys, the wine, her phone, about $50-$100 cash, and earrings — all of which were taken by the offenders. After robbing her, the offenders got into the vehicle that Watters had walked around and left the scene.

{¶ 9} Counts 16, 17, and 18 stemmed from an incident occurring on December 11, 2021, in Lakewood, Ohio. The victims were Lindsay Sovchik and L.S. (d.o.b. 6/28/2016), Sovchik's minor daughter. Sovchik testified that L.S. was sick that evening, so the two went to CVS convenience store together to get medicine and returned to their home on Arden Avenue around 7 p.m. As they exited the vehicle, two people in dark clothing wearing masks walked towards them and "then immediately, there was a gun." (Tr. 1069.) The offenders each had a gun, and one was held to Sovchik's stomach and the other to L.S.'s head. Sovchik testified that the offenders took her purse, searched her pockets, forcibly grabbed her lanyard with her car keys on it, and attempted to take the CVS bag holding L.S.'s medicine. Sovchik testified that her lanyard with car keys was grabbed so hard that the offender, who she believed was male, ripped the lanyard. Sovchik asked the

offenders to return the CVS bag to her, explaining that L.S. was sick. The offenders gave the CVS bag back. Then, Sovchik asked if they were going to take her car, noting the key FOB that was forcibly taken from her hands. The male voice answered that they would not and threw the key FOB into the middle of the street. When Sovchik ran to retrieve the key FOB, the offenders retreated to a vehicle and left the scene.

{¶ 10} Counts 19 and 20 stemmed from an incident on December 19, 2021, in Lakewood, Ohio. The victim, Madison MacArthur, was returning home from seeing a movie with friends. She parked her car on the street near her apartment when she noticed headlights pull in immediately behind her. The vehicle that pulled in behind her lightly bumped her car. When she got out to examine the damage, a male and a female got out of the other vehicle and also looked at the damage. MacArthur, finding no damage, retreated back to the driver's side of her vehicle. As she opened her door, she was approached from behind by the male, who displayed a gun and told her not to make any noise. Against the offender's instruction, MacArthur began screaming and the male reached past her and grabbed her purse that was sitting in the passenger seat. After taking her purse, the offenders retreated to the waiting vehicle. MacArthur followed them to the car and placed her hands on the hood of the car, hoping to delay their getaway until the police came. The driver of the car revved the engine, began to drive off, and MacArthur jumped out of the way, sustaining abrasions to her body. Notably, when police arrived on scene, MacArthur was able to point to a green lighter that the offender was holding before the situation became violent and had apparently dropped in the street.

{¶ 11} In the middle of the trial, Hite, whose charges were being tried to the bench, accepted a plea deal and the jury was advised that the trial would proceed against defendants Hagwood and McLoyd only. Hagwood tried all four charges of having a weapon while under a disability and every underlying firearm specification to the bench, but all other charges to the jury. At the conclusion of trial, the jury found Hagwood guilty of aggravated robbery under Counts 1, 2, 5, 8, 9, and 14; kidnapping under Counts 3 and 6; felonious assault under Count 7; and aggravated robbery under Counts 16 and 19. The court found Hagwood guilty of having a weapon while under a disability under Counts 12, 15, 18, and 20. The court also found Hagwood guilty of the firearm specifications associated with the above counts.

{¶ 12} The jury found Hagwood not guilty of felonious assault under Count 4 (victim: Ghivens) and kidnapping under Count 17 (victim: L.S.). The court found Hagwood not guilty of the firearm specifications underlying both of these charges.

{¶ 13} A two-day sentencing hearing commenced on September 27, 2022. The state elected to sentence Hagwood on Counts 2 and 5. The trial court determined that the following Counts were allied offenses: Counts 2 and 3; Counts 5, 6, and 7; Counts 2, 3, 5, 6, 7, and 8. The court also found that Counts 2, 5, and 12 were committed as part of the same act or transaction and therefore, did not sentence Hagwood pursuant to the firearm specification attached to Count 12 and further did not impose any sentence for Counts 3, 6, 7, and 8. On the remaining firearm specifications, Hagwood received 54 months that were run consecutive to each other, for a total of 540 months (45 years). On the underlying convictions, the

court imposed 4 years each on Counts 1, 2, 5, 9, 14, 16, and 19; and 12 months each on Counts 12, 15, 18, and 20, which were all run concurrently, to be served after the prison term for the firearm specifications, for a total sentence of 49 years.

{¶ 14} Hagwood appeals, assigning two errors for our review.

I. Appellant's convictions are against the manifest weight of the evidence.

II. The trial court's sentence violated appellant's eighth amendment rights.

## II. Law and Analysis

### A. Cell Tower Data and Manifest Weight

{¶ 15} In his first assignment of error, Hagwood argues that his convictions were against the manifest weight of the evidence because "Hagwood's conviction rested largely on [the state's] presentation of 'cell tower triangulation' to infer that [Hagwood] was near the robbery locations at some points during the times in question." He also argues that the state failed to present "credible evidence" that Hagwood possessed the phone at the time of the robberies.

{¶ 16} "The admission or exclusion of evidence is a matter left to the trial court's sound discretion; therefore, it will not be disturbed absent an abuse of discretion." *State v. Frazier*, 8th Dist. Cuyahoga No. 97178, 2012-Ohio-1198, ¶ 17, citing *State v. Lundy*, 41 Ohio App.3d 163, 169, 535 N.E.2d 664 (1st Dist.1987); *State v. Duncan*, 53 Ohio St.2d 215, 219, 373 N.E.2d 1234 (1978). An abuse of discretion is a decision that is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 450 N.E.2d 1140 (1983).

{¶ 17} A manifest-weight review of the evidence concerns the burden of persuasion. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 19. In conducting a manifest-weight review of the evidence, the appellate court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 172, 485 N.E.2d 717 (1st Dist.1983). The Ohio Supreme Court has repeatedly referred to the appellate court's role in conducting a manifest-weight review as that of a thirteenth juror. *State v. Martin*, 170 Ohio St.3d 181, 2022-Ohio-4175, 209 N.E.3d 688, ¶ 26, citing *Thompkins* at *id.* In conducting our manifest-weight review, we are mindful of certain propositions of law relevant to this case. First, circumstantial and direct evidence inherently possess the same probative value. *State v. Jenks*, 61 Ohio St.3d 259, 272, 574 N.E.2d 492 (1991). Second, an offender aids or abets another when he supports, assists, encourages, cooperates with, advises, or incites the principal in the commission of the crime and shares the criminal intent of the principal. *State v. Johnson*, 93 Ohio St.3d 240, 243, 754 N.E.2d 796 (2001). "Such intent may be inferred from the circumstances surrounding the crime." *Id.* at 246.

{¶ 18} In support of this assignment of error, Hagwood offers the following argument:

> Cell phones are ubiquitous and their use can no longer confidently ascribed [sic] to any one person at any one time without supporting evidence. Further, cellular technologies have advanced such that

"triangulation," always a makeshift analysis, no longer describes the movement of data over the infrastructure. To the extent that Hagwood's jury placed their reliance on the state's presentation of an eclipsed technology in its determination of his guilt, they lost their way.

{¶ 19} Hagwood appears to argue that absent this evidence placing Hagwood's alleged cell phone at the scene of each of the incidents, the state would be otherwise unable to support Hagwood's convictions. Hagwood fails to fashion a legal argument explaining why this technology is unreliable or point to any caselaw where other courts have found that this evidence is otherwise unreliable or antiquated. At trial, the following evidence regarding Hagwood's cell phone and the relevant location data was elicited.

{¶ 20} A cell phone number serviced by AT&T and allegedly belonging to Hagwood was introduced at trial. The number was obtained from Harkness, who allowed investigators to take the number from her phone.

{¶ 21} Robert Norman ("Det. Norman"), a Cleveland Police Detective in the Violent Crimes Response Team Unit, testified that after obtaining Hagwood's alleged cell phone number, he attempted to locate Hagwood's current location by obtaining search warrants on the GPS coordinates. After the search warrant was answered, he was led directly to Hagwood's location and arrested Hagwood, demonstrating that the number and cell phone likely belonged to Hagwood and that Hagwood carried the device on his person.

{¶ 22} Det. Norman also obtained a search warrant for the records associated with Hagwood's alleged cell phone number, including GPS locations for the days leading up to Hagwood's arrest and the months matching those on the indictment.

{¶ 23} Matthew Seabold ("Seabold"), a crime analyst in the Cuyahoga County Prosecutor's Office, testified regarding his involvement in analyzing the cell phone data that was received from the search warrants. After receiving the location data from the cell phone provider, that Hagwood stipulated to the authenticity of, Seabold input the coordinates into a program that generated a map showing the area where the cell phone was located based on the coordinates directly taken from the documents received from AT&T in response to the warrant. Seabold's testimony and a PowerPoint that he made relating to Hagwood's alleged cell phone number indicated that the cell phone records obtained from Hagwood's purported cell phone number linked Hagwood's phone to Happy's Pizza at the time of the incident; the location where Lyons was walking at the time of the Cleveland Heights robbery; the location of the Watters robbery; the location of Sovchik's robbery; and MacArthur's robbery, all around the times that these incidents were alleged to have occurred. Seabold admitted that he is not an expert in cell phone mapping or triangulation but is experienced in placing the records received from the cell phone companies into a software that then generates a map showing the location of the cell phone for each record. Seabold was vigorously cross-examined about the reliability of the technology, the disclaimers involved, the software used, and how often these technologies are used.

{¶ 24} Hagwood's arguments regarding the reliability of the cell phone location data are not persuasive. The jury was presented with the discussed evidence and each of these witnesses were cross-examined. The jury was free to accept or reject the evidence presented relating to Hagwood's cell phone number and the technology utilized in obtaining this data. Hagwood has not pointed to any caselaw indicating that cell phone triangulation or cell site mapping are no longer a reliable form of evidence. On the contrary, numerous Ohio courts, including ours, have affirmed convictions that partially established a defendant's presence near the scene of a crime using cell phone triangulation and/or cell site location data. *See, e.g., State v. Bradford*, 2018-Ohio-1417, 101 N.E.3d 710, ¶ 86 (8th Dist.) ("Typically, cell phone tower mapping by a layperson permits an inference to be drawn by the factfinder that the cell phone owner was in the area at the listed time, to corroborate other evidence of the defendant's presence at a crime scene."); *State v. Daniel*, 2016-Ohio-5231, 57 N.E.3d 1203, ¶ 70 (8th Dist.) (finding that any potential problems with cell phone location data goes to the weight of the testimony — not to the reliability or admissibility of the testimony); *State v. Dunn*, 8th Dist. Cuyahoga No. 101648, 2015-Ohio-3138, ¶ 45 ("A review of the record demonstrates that no *witness* testified about Dunn's location at the time of the murder by means of cell phone tower location and mapping. Any inferences or speculation about Dunn's location by use of this cell phone evidence was established by the state during its closing argument."); *State v. White*, 2015-Ohio-3512, 37 N.E.3d 1271, ¶ 28 (2d Dist.)

(observing that numerous federal courts widely accept the use of cell phone location records to determine the general location of a cell phone and holding the same).

{¶ 25} Based on *Bradford*, indicating that the cell phone location data may be used to corroborate other evidence placing a defendant at a crime scene, the next step in our manifest-weight review is to determine whether additional evidence aside from the cell phone location data was presented linking Hagwood to the scene of each crime.

{¶ 26} The three robberies that occurred on the evening of November 2, 2021: Pape, Happy's Pizza, and Lyons were all committed in a dark colored four-door sedan that was later determined to be a dark blue Nissan Altima registered in Hite's name. Detective Zachary New ("Det. New") of the Cleveland Police Department, who assisted with obtaining the surveillance footage from the Happy's Pizza robbery, opined regarding the similar modus operandi of these crimes, along with the dark-colored Nissan Sedan, as follows:

> At that particular time[,] we had similar incidents with neighboring agencies; dark blue Nissan Sedan, for example, where we had a male and female suspect that were robbing individuals at gunpoint. At which point, the suspect vehicle was used to drive to and from these incidents so we — while working with outside agencies, we were able to sort of see that a pattern was being formed here; that this is more than likely the same vehicle, same suspects.

(Tr. 1099.)

{¶ 27} Detective Daniel Hilfiker ("Det. Hilfiker") of the Lakewood Police Department testified that while he was investigating the Pape robbery, he received a call from Pape; she had posted about her incident on a Facebook group as a

warning to others in Lakewood, and someone from Happy's Pizza sent her footage of the suspects involved in that robbery, and she expressed that "the people who had robbed her looked similar to the people who she saw in that video." (Tr. 1433.) Armed with this information, Det. Hilfiker reached out to a residence with home security cameras near the area of Pape's robbery. The video was played to the jury, and Det. Hilfiker described it as follows:

> You see the vehicle driving north on Bunts Road, and it makes a left turn facing westbound onto Merl. Pulls over on the north side of Merl close to the curb, and then while the car is parking you can see a single person walking northbound on the west sidewalk of Bunts. That was determined to be our victim Ms. Pape. And then as the video rolls along you see two people get out of that vehicle that had stopped and they start walking north on Bunts following behind Ms. Pape.

(Tr. 1437.)

{¶ 28} The stills from the home security footage show that the suspect vehicle "appears to be a blue small four-door Sedan." (Tr. 1439-1440.) Dets. Hilfiker and New compared photographs from the Happy's Pizza and Pape robberies and confirmed that the vehicle was likely the same. Det. Robinson and Ofc. Dugan from Cleveland Heights, who were investigating the Lyons robbery, were also looking for a dark blue Nissan sedan after Ofc. Dugan engaged the vehicle in a high-speed chase.

{¶ 29} After Det. Hilfiker and Det. New realized the possible relation of these three robberies, Det. New put out a BOLO for the dark colored Nissan thought to be involved. The vehicle was located on November 4, 2021, during the afternoon hours, occupied by Aliyah Nelson ("Nelson") who indicated that the vehicle belonged to her romantic partner, Hite. Nelson testified at trial that the two of them would share

vehicles and grab whatever set of keys was convenient. Her vehicle, a silver Chevrolet Cruze, was often used by Hite. Dets. New and Hilfiker both testified regarding the various features of the vehicle that they thought were consistent with the vehicle in the Happy's Pizza footage, including the aluminum rims. They also testified as to several features on the interior of the vehicle that made them believe it was the same vehicle from the surveillance footage, including the presence of a car seat that affected where someone could get into the vehicle, and a distinct glove found inside that was shown being worn by one of the offenders in the Happy's Pizza footage. After the search of the vehicle was executed, items belonging to Lyons were recovered from the vehicle that Lyons confirmed were in her purse on the night she was robbed.

{¶ 30} Det. New also connected Hagwood to the November 2, 2021 robberies based on weapon comparisons. Det. New explained that when Hagwood was arrested, he had a 9 mm Glock 17 in his possession. Det. New opined that this was the same gun that can be seen in the Happy's Pizza surveillance footage, and discussed similar characteristics that could been seen on both guns, including wear and tear that was visible in the Happy's Pizza footage and on the gun recovered from Hagwood. Det. Norman corroborated Det. New's testimony, opining about the similarities of the gun recovered from Hagwood and the gun shown on the surveillance footage in the Happy's Pizza robbery. Additionally, Lyons testified that the gun used in her robbery was similar to that of a police officer's gun, which are typically Glocks.

{¶ 31} Det. Norman testified regarding the known association of McLoyd, Hite, and Hagwood, and how he was able to discern that these three individuals are associates. He discussed interactions between McLoyd, Hite, and Hagwood on Instagram. On the date of the Pape, Happy's Pizza, and Lyons robberies, McLoyd and Hagwood direct messaged each other on Instagram about meeting up and "doing what would be called a, 'lick[.]'" (Tr. 1228.) Det. Norman opined that a "lick," in his experience is "an opportunity to commit a theft offense that yields profit" and also opined that it's "a robbery basically[.]" (Tr. 1229.) Det. Norman testified that it was through McLoyd's social media that he was able to determine that Hagwood might be involved with the events. Also introduced into evidence was a text message from Hite to Nelson, revealing that shortly after the time of the Lyons robbery, Hite sent a text message to Nelson informing her, "I just got in a high[-]speed chase I need to come to your house or some [sic][.]"

{¶ 32} On November 4, 2021, Watters was robbed in Lakewood by two offenders who absconded in a waiting silver, light-colored vehicle. Det. Hilfiker noted that in the course of his investigation, he learned of the Watters robbery and noted that the modus operandi was similar to the others that he was investigating. He reviewed the body camera footage from the evening of the Watters robbery and noted that Watters explained "that she had been robbed by one black male and one black female on the street in front of her apartment building. Then they got into a car and left the area[.]" (Tr. 1446.) He explained that at this point, he had learned from the Cleveland Police Department that he should also look out for Nelson's

vehicle, the silver Chevrolet Cruze "that had pink on the front rear bumpers and a temp tag in the upper left-hand corner of the window" that Hite was known to drive. (Tr. 1447.) When Det. Hilfiker eventually met with Nelson, he learned that Nelson had discarded some items from her Chevrolet Cruze. After searching the trash, he found several items that Nelson confirmed she had thrown out from the vehicle, including a pair of brown gloves and a glass wine bottle that Watters confirmed was the wine bottle she was carrying on the night she was robbed.

{¶ 33} Jeffrey Oblock ("Oblock"), a forensic scientist in the Cuyahoga County Regional Forensic Science Laboratory, testified regarding the DNA evidence associated with this case and the corresponding reports that he prepared. Oblock testified that he tested swabs from the mouth of the wine bottle and two brown gloves recovered from Nelson's vehicle. The mouth of the wine bottle contained a match for Hagwood's DNA. The gloves contained a mixture of DNA from both McLoyd and Hagwood, each contributing about 20 percent of the DNA found on the gloves. Det. Hilfiker also recovered a pair of earrings directly from Nelson's vehicle that Watters confirmed were stolen from her pockets on the night she was robbed.

{¶ 34} Relating to Sovchik's robbery, Sovchik testified that she believed that the two offenders were male and that the voice who spoke to her was male. Oblock also tested swabs from the key FOB that one of the offender's grabbed and threw into the street during Sovchik's robbery, and the swab returned a positive match for Hagwood's DNA.

{¶ 35} Finally, the MacArthur robbery involved a male and female offender, and MacArthur could confidently say this because she saw them examining the damage to the two vehicles before they robbed her, and she testified that the male was wielding the gun. She also noticed that the male was holding a green lighter, which was later recovered from the street and DNA tested. Oblock testified that four items were submitted for testing — a green lighter, a swab of the lighter igniter cylinder, a swab of the plastic body of the lighter, and Hagwood's DNA swab. The lighter igniter cylinder had an insufficient quantity of human DNA for testing. The plastic body of the lighter swab contained a match for Hagwood's DNA, and the TrueAllele software determined that Hagwood's DNA was a 60 percent contributor to the DNA on the plastic body of the lighter.

{¶ 36} Officer Justin Bly of the Lakewood Police Department reviewed city-owned camera footage from two streets east of the MacArthur incident, and observed a small, silver sedan accelerating rapidly. Detective Amelio Leanza ("Det. Leanza") of the Lakewood Police Department corroborated that his review of the city's camera footage revealed that the suspect vehicle was a silver sedan. Det. Leanza also noted that while investigating this case, he showed MacArthur a lineup of photos including Hagwood. While MacArthur did not select Hagwood's photo, he testified that her description of the perpetrator very closely matched Hagwood's over the other individual that she selected.

{¶ 37} Cell site location evidence has been widely accepted and utilized in criminal proceedings and Hagwood has not produced any evidence refuting such

use or demonstrating otherwise. Additionally, the cell site tower evidence, when viewed in conjunction with the other evidence admitted at trial as thoroughly discussed above, was consistent, competent, credible evidence upon which a trier of fact could have reasonably found, beyond a reasonable doubt, that Hagwood was a direct perpetrator or complicit in all the above crimes. Accordingly, Hagwood's convictions are not against the manifest weight of the evidence and Hagwood's first assignment of error is overruled.

### B. Hagwood's Sentence and the Eighth Amendment

{¶ 38} In his second assignment of error, Hagwood argues that "the trial court's imposition of 45 years of mandatory, consecutive firearm specifications out of a total sentence of 49 years of incarceration shocks the community's sense of justice, both in comparison to other crimes and on a standalone basis."

{¶ 39} Both the United States and Ohio Constitutions provide that cruel and unusual punishments shall not be inflicted. Section 9, Article I of the Ohio Constitution; Eighth Amendment to the U.S. Constitution. This includes the notion that punishment should be graduated and proportional to the offense. *State v. Anderson*, 151 Ohio St.3d 212, 2017-Ohio-5656, 87 N.E.3d 1203, ¶ 27, citing *State v. Moore*, 149 Ohio St.3d 557, 2016-Ohio-8288, 76 N.E.3d 1127, ¶ 31. A punishment is typically considered cruel and unusual when "the penalty [is so] greatly disproportionate to the offense as to shock the sense of justice of the community." *McDougle v. Maxwell*, 1 Ohio St.2d 68, 70, 203 N.E.2d 334 (1964).

{¶ 40} Nonetheless, if a sentence is within the terms of a valid statute, it does not amount to cruel and unusual punishment. *State v. Juliano*, 24 Ohio St.2d 117, 120, 265 N.E.2d 290 (1970), citing *McDougle* at 69; *accord State v. Hairston*, 118 Ohio St.3d 289, 2008-Ohio-2338, 888 N.E.2d 1073, ¶ 21. Further, "it is not the aggregate term of incarceration, but rather, the individual sentences that are relevant for purposes of Eighth Amendment analysis." *State v. Vinson*, 2016-Ohio-7604, 73 N.E.3d 1025, ¶ 54 (8th Dist.), citing *Hairston* at ¶ 22. "Where none of the individual sentences imposed on an offender are grossly disproportionate to their respective offenses, an aggregate prison term resulting from consecutive imposition of those sentences does not constitute cruel and unusual punishment." *Id*. at ¶ 20.

{¶ 41} Hagwood received a total of 45 years on the firearm specifications. The Ohio Supreme Court has recognized that

> [t]he purpose of a firearm specification is to enhance the punishment of criminals who voluntarily introduce a firearm while committing an offense and to deter criminals from using firearms. In enacting firearm specifications, the General Assembly recognized that "a criminal with a gun is both more dangerous and harder to apprehend than one without a gun." *State v. Powell*, 59 Ohio St.3d 62, 63, 571 N.E.2d 125 (1991).

*State v. White*, 142 Ohio St.3d 277, 2015-Ohio-492, 29 N.E.3d 939, ¶ 31.

{¶ 42} Hagwood's sentence is controlled by R.C. 2929.14(B)(1)(g) which provides, in relevant part:

> If an offender is convicted of * * * two or more felonies, if one or more of those felonies are * * * aggravated robbery [or] felonious assault, * * * and if the offender is convicted of * * * [a 54-month firearm specification] * * * in connection with two or more of the felonies, the sentencing court shall impose on the offender the [54-month] prison term * * * for each of the two most serious specifications of which the

offender is convicted * * * and, in its discretion, also may impose on the offender the prison term specified under that division for any or all of the remaining specifications.

{¶ 43} Thus, the court was statutorily given discretion to impose a sentence pursuant to the firearm specifications "for any or all of the remaining specifications." Since the sentence imposed upon Hagwood is within the terms of R.C. 2929.14(B)(1)(g), which has not been found unconstitutional or invalid, the court's sentence cannot be considered cruel and unusual punishment.

{¶ 44} Hagwood's second assignment of error is overruled.

### III. Conclusion

{¶ 45} Hagwood's argument that the cell phone location evidence was improper to convict him is rejected because a review of the record demonstrates that additional evidence presented at trial places Hagwood at the incidents giving rise to this case and cell phone location data has been widely accepted by Ohio courts for its evidentiary quality. Further, Hagwood's sentence does not constitute cruel and unusual punishment because the trial court's sentence was within the terms of R.C. 2929.14(B)(1)(g).

{¶ 46} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's

convictions having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
FRANK DANIEL CELEBREZZE, III, JUDGE

ANITA LASTER MAYS, A.J., and
MARY J. BOYLE, J., CONCUR