[Cite as *State v. Reed*, 2024-Ohio-4838.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## HANCOCK COUNTY

STATE OF OHIO

      PLAINTIFF-APPELLEE,

  v.

ERIC A. REED, A.K.A.
ERIC ALANZO JONES,
A.K.A. ERIC A. REED, III,

      DEFENDANT-APPELLANT.

CASE NO. 5-23-50

O P I N I O N

Appeal from Hancock County Common Pleas Court
Trial Court No. 2022CR00216

**Judgment Affirmed**

**Date of Decision:  October 7, 2024**

**APPEARANCES:**

    *Lawrence A. Gold* **for Appellant**

    *Colleen P. Limerick* **for Appellee**

**WILLAMOWSKI, P.J.**

{¶1} Defendant-appellant Eric A. Reed ("Reed") appeals the judgment of the Hancock County Court of Common Pleas, arguing that his convictions are not supported by sufficient evidence; that his convictions are against the manifest weight of the evidence; and that the trial court abused its discretion by permitting expert testimony at trial. For the reasons set forth below, the judgment of the trial court is affirmed.

*Facts and Procedural History*

{¶2} In November of 2016, Brian McQuistion ("McQuistion") had several criminal charges pending against him and agreed to work with law enforcement as a confidential informant. Over the next several months, McQuistion participated in thirteen controlled buys, purchasing drugs from five or six different individuals. In two of these operations, he bought drugs from Dominique Blakely ("Blakely"). On October 31, 2017, a grand jury returned an indictment that charged Blakely with two fifth-degree felonies based on these two controlled buys.

{¶3} On November 2, 2017, Blakely was arrested and subsequently discovered that McQuistion had been working as a confidential informant. Blakely then told his uncle, Reed, about this situation. Blakely later testified that Reed responded by telling him "to be careful" and by saying that "he was going to look *

* * into it, or take care of it * * *." (Tr. 680). In 2017, Reed was living in Texas but visited Blakely where he lived in Fostoria, Ohio.

{¶4} On November 24, 2017, Reed spent the night at Blakely's house. On the following day, Reed and Blakely drove to a party on Parkside Place in Findlay, Ohio to watch Ohio State University play Michigan. Blakely testified that, after the football game was over, he drove Reed in a white car to the area where McQuistion lived on East Foulke Avenue in Findlay. Blakely testified that he dropped Reed off near McQuistion's house so that Reed could "take care of Brian [McQuistion]." (Tr. 699). Blakely then drove to a local gas station where he filled up his vehicle while he waited for Reed to call him for a ride.

{¶5} During this time, Grant Householder ("Householder") was visiting at McQuistion's house. After the Ohio State-Michigan football game was over, Householder was in the living room with McQuistion when they heard someone knock on the front door. McQuistion then left the living room and went into an adjacent room where he opened the front door. Householder then heard the sound of a gunshot. Householder then waited in the living room for a few minutes before he left through the back of the house.

{¶6} As he walked away from McQuistion's house, Householder called his girlfriend, Stephanie Eisentrager ("Eisentrager"). During their conversation, his girlfriend told him to call the police. Householder then dialed 9-1-1 at 5:51 P.M. and told the dispatcher that he heard a gunshot while he was walking in the area of

East Foulke Avenue. He later testified that he did not provide more information because he was "scared for [his] life." (Tr. 370-371). While a patrol car was sent to this area, the officer did not observe any unusual activity and cleared the call.

{¶7} In between 5:46 and 5:49 P.M., Reed placed three calls to Blakely. During the time of the first two calls, Blakely was still at the gas station. But by the time of the third call, Blakely was several blocks away from East Foulke Avenue in the area of George Street. Blakely testified that he picked up Reed near the intersection of George Street and Main Street. They drove back to the house on Parkside Place where they had watched the football game earlier.

{¶8} After Householder had called 9-1-1, Eisentrager drove to pick him up. At the time of the shooting, Eisentrager had been with McQuistion's girlfriend, Tamara Arce ("Arce"). Householder, Eisentrager, and Arce then went to a local Waffle House to purchase drugs. They then went to Arce's house. At 8:03 P.M., Arce called 9-1-1 and reported that McQuistion had been shot.

{¶9} The police were dispatched to McQuistion's address and found that the interior door to his house was partially open, though the screen door was closed. The police then discovered McQuistion's body lying on the floor with a gunshot wound to his head. McQuistion was pronounced dead at 8:14 P.M. on November 25, 2017. The police did not locate any shell casings in the vicinity of his body. During the autopsy, a bullet was removed from McQuistion's head.

{¶10} On March 28, 2018, the State moved for dismissal of one of the charges against Blakely that had arisen out of the controlled buys with McQuistion. In its motion, the State indicated that this request was being made pursuant to plea negotiations and because "an essential witness [wa]s not available * * *." (Ex. 114). While he had been charged with two fifth-degree felonies for his involvement in the controlled buys, Blakely ended up pleading guilty to a first-degree misdemeanor.

{¶11} During the investigation into McQuistion's death, the police requested geolocation information from Google to determine whether any identifiable cellular devices were in the vicinity of the crime scene at the time of the murder. This data indicated that a cellular device belonging to Blakely moved to an alleyway near to McQuistion's house at 5:40 P.M. and was situated at that point for roughly thirty seconds before leaving. By 5:42, Blakely's device was located at an area gas station. At 5:47, the device left the gas station and had moved to a location on George Street by 5:50 before returning to a house on Parkside Place at 5:55.

{¶12} Law enforcement then sought security camera footage from various locations along the route that Blakely's cellular phone had taken according to the geolocation data. In security camera footage obtained from the gas station, a white car can be seen pulling into the parking lot at the time the geolocation data indicated Blakely's cellular phone was in that area. When presented with images from this security camera footage, Blakely identified himself as the person who got out of this white car at the gas station.

{¶13} The police then obtained recordings from a security camera near the intersection of George Street and Main Street. In this footage, a pedestrian can be seen at roughly 5:48 P.M. on November 25, 2017 walking down Main Street. This pedestrian was wearing apparel that resembled what Reed had been wearing in a selfie he had posted on Facebook earlier that day. At trial, Blakely identified Reed as the pedestrian in the footage.

{¶14} On October 25, 2018, the police executed a search warrant on Blakely's residence and located a twenty-two caliber revolver that contained two spent shell casings. Blakely testified that Reed had given this gun to him for protection. He also testified that he was not sure whether Reed knew where the revolver was kept at the house and that he did not see Reed with a gun on the date of McQuistion's death.

{¶15} The police later examined Facebook messages between Reed and Blakely. On January 10, 2018, the following exchange occurred:

[Reed]: Nephew dont get us f**k up by bringing tht hot a** thing out

[Blakely]: UNC calm down i jus wanted to know where it was at jus
n there is an emergency

[Reed]: I am gonna get u something

[Blakely]: ok bet good looking

[Reed]: Really. You need to get rid of tht for good

[Reed]: Tht got our life on it

-6-

[Blakely]:  I'm not even Guna touch it unless I have to

[Reed]:  Ok when i come back i will bring you one

[Blakely]:  Cool

[Reed]:  And we will get rid of tht together

(Ex. 94).  Blakely testified at trial that they were talking about what to do with the revolver because it "was the gun that was used * * * to kill Brian [McQuistion]" and was evidence.  (Tr. 783).  He further testified that, while Reed indicated in these messages that they would get rid the gun together, Reed never returned to Ohio to dispose of the revolver.

{¶16} This revolver was later tested at the Ohio Bureau of Criminal Investigation ("BCI") by Kevin Kramer ("Kramer").   In his report, Kramer determined that the bullet recovered from McQuistion's remains was fired from a gun with similar class characteristics to the revolver from Blakely's house.  However, the bullet recovered from McQuistion was "heavily damaged."  (Tr. 617).  For this reason, the individual characteristics of the bullet were not sufficiently similar to support a conclusion as to whether this was the gun that was fired at McQuistion.  Based on the class characteristics, Kramer could only conclude that this gun "could have fired the bullet."  (Tr. 614).

{¶17} During his testimony, Kramer also explained that the shell casings for this revolver remain inside the cylinder and are not automatically ejected when the gun is fired.  Officer Kevin Cieplowski testified that no shell casings were located

around McQuistion's body at the scene of the homicide. Detective Brandon Bell also testified that the revolver found in Blakely's house could hold nine bullets. At the time this gun was discovered, the police observed that the revolver contained "seven live unfired rounds" and "two spent shell casings." (Tr. 570). Blakely later testified that he had fired one of these rounds "in the air" to scare a "crackhead" away from him. (Tr. 770).

{¶18} On March 25, 2021, Blakely was interviewed by the police while he was serving time in prison in Wood County for charges unrelated to this case. Initially, Blakely was not forthcoming with officers about what transpired on November 25, 2017. However, after the police showed him the security camera footage of him at the gas station, he admitted that he had driven Reed to a location near to McQuistion's house on the night of the murder. Blakely later gave testimony before a grand jury proceeding that implicated Reed in McQuistion's death.

{¶19} On April 26, 2022, Reed was indicted on one count of aggravated murder in violation of R.C. 2903.01(A), an unclassified felony; one count of having weapons while under disability in violation of R.C. 2923.13(A)(2), a third-degree felony; and one count of having weapons while under disability in violation of R.C. 2923.13(A)(3), a third-degree felony. The count of aggravated murder carried a three-year firearm specification pursuant to R.C. 2941.145(A).

{¶20} On October 23, 2023, a jury trial commenced on these charges. Householder and Blakely testified as witnesses for the State. On October 27, 2023,

the jury returned verdicts of guilty on all the charges against Reed. At sentencing, the trial court determined that the two counts of having weapons while under disability merged. The State elected to proceed on the count that charged Reed with a violation of R.C. 2923.13(A)(2). The trial court issued its judgment entry of sentencing on October 31, 2023.

{¶21} Reed filed his notice of appeal on November 16, 2023. On appeal, he raises the following three assignments of error:

**First Assignment of Error**

**The trial court erred in denying Appellant's Crim.R. 29 motion.**

**Second Assignment of Error**

**The jury's verdict was against the manifest weight of the evidence presented at trial.**

**Third Assignment of Error**

**The trial court abused its discretion by allowing expert testimony from a witness that was not designated as an expert.**

We are going to consider the third assignment of error before proceeding to the first and second assignments of error.

*Third Assignment of Error*

{¶22} Reed argues that the trial court abused its discretion by permitting Kramer to testify when the State never made a formal statement that expressly tendered him as an expert witness.

## Standard of Review

**{¶23}** In general, a determination on the admissibility of relevant evidence is entrusted to the sound discretion of the trial court. *State v. Little*, 2016-Ohio-8398, ¶ 8 (3d Dist.). For this reason, a trial court's ruling on the admission of evidence is reviewed for an abuse of discretion. *State v. Sullivan*, 2017-Ohio-8937, ¶ 20 (3d Dist.). Thus, an appellate court is not to substitute its judgment for that of the trial court but will reverse a trial court's decision only if it is unreasonable, arbitrary, or capricious. *State v. Howton*, 2017-Ohio-4349, ¶ 23 (3d Dist.).

**{¶24}** However, if no objection is raised to the evidence at trial, all but plain error is waived on appeal. *State v. Baskin*, 2019-Ohio-2071, ¶ 48 (3d Dist.). Crim.R. 52(A) states that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

> For plain error to apply, the trial court must have deviated from a legal rule, the error must have been an obvious defect in the proceeding, and the error must have affected a substantial right. * * * Under the plain error standard, the appellant must demonstrate that there is a reasonable probability that, but for the trial court's error, the outcome of the proceeding would have been otherwise.

(Citations omitted.) *State v. Bradshaw*, 2023-Ohio-1244, ¶ 67 (3d Dist.). Plain error is recognized "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

Legal Standard

**{¶25}** Under Evid.R. 702, a witness may offer testimony as an expert if he or she meets the following criterion:

> (A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
>
> (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;
>
> (C) The witness' testimony is based on reliable scientific, technical, or other specialized information and the expert's opinion reflects a reliable application of the principles and methods to the facts of the case. * * *

Evid.R. 702. "Courts should favor the admissibility of expert testimony when the expert testimony is relevant and meets the Evid.R. 702 criteria." *State v. Morris*, 2022-Ohio-3608, ¶ 17 (3d Dist.).

Legal Analysis

**{¶26}** On appeal, Reed points out that the State did not make a formal request to designate Kramer as an expert witness at trial. However, he does not argue that Kramer did not have the qualifications to testify as an expert or challenge any of the conclusions that he reached. *See State v. Alley*, 2024-Ohio-115, ¶ 46 (6th Dist.). Further, since Reed concedes that no objection was raised over this issue at trial, we will review this argument for plain error only.

{¶27} In this case, the State called Kramer to testify about the tests that had been performed on the revolver discovered at Blakely's residence. His testimony began with an extensive discussion of his training, education, and experience. He stated that, in the ten years he had worked in the firearm section of BCI, he had tested "hundreds" of guns and had been qualified to testify as an expert in roughly forty trials. (Tr. 582). The State also presented a copy of Kramer's curriculum vitae for admission into evidence.

{¶28} The record contains ample information that establishes that Kramer was qualified to testify as an expert witness. In response to this information, Reed has advanced no argument that explains how he was prejudiced by the State's failure to make a formal request to designate Kramer as an expert witness. For this reason, we conclude that Reed has not carried the burden of establishing plain error. *State v. Powell*, 2012-Ohio-2577, ¶ 146; *State v. Thompson*, 2014-Ohio-4751, ¶ 139. Accordingly, the third assignment of error is overruled.

*First Assignment of Error*

{¶29} Reed argues that his convictions for aggravated murder and having weapons while under disability are not supported by sufficient evidence.

Legal Standard

{¶30} A sufficiency-of-the-evidence analysis examines whether the State has carried its burden of production at trial. *State v. Richey*, 2021-Ohio-1461, ¶ 16 (3d Dist.). On review, an appellate court is not to consider whether the evidence at

trial should be believed but whether the evidence, if believed, could provide a legal basis for the finder of fact to conclude that the defendant is guilty of the crime charged. *State v. Smith*, 2023-Ohio-3015, ¶ 19 (3d Dist.). Accordingly, the applicable standard "is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt." *State v. Plott*, 2017-Ohio-38, ¶ 62 (3d Dist.).

**{¶31}** To establish a conviction for aggravated murder in violation of R.C. 2903.01(A), the State must prove that the defendant "purposely, and with prior calculation and design, cause[d] the death of another * * *." R.C. 2903.01(A). Further, to establish a firearm specification under R.C. 2941.145(A), the State must prove "that the offender had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense." R.C. 2941.145(A).

**{¶32}** To establish a conviction for having weapons while under disability in violation of R.C. 2923.13(A)(2), the State must prove that the defendant "knowingly acquire[d], ha[d], carr[ied], or use[d] any firearm or dangerous ordinance"; was "under indictment for or has been convicted of any felony offense of violence or has been adjudicated a delinquent child for the commission of an offense that, if committed by an adult, would have been a felony offense of violence"; and had not

been "relieved from disability under operation of law or legal process." R.C. 2923.13(A)(2).

Legal Analysis

{¶33} First, Reed argues that the prosecution did not produce sufficient evidence to establish that he committed aggravated murder. At trial, the State presented evidence that McQuistion was a confidential informant who purchased drugs from Blakely in a controlled buy. Blakely testified that Reed was his "mentor" and "a father figure" to him. (Tr. 742). He stated that, after being charged over these transactions, he informed Reed of McQuistion's work as a confidential informant. Blakely testified that Reed responded by saying that "all snitches got to go" and "that he was going to look * * * into it, or take care of it * * *." (Tr. 680-681). He also affirmed that Reed told him that "snitches must die[.]" (Tr. 787).

{¶34} Blakely further testified that, after the football game on November 25, 2017, he drove Reed to East Foulke Avenue in Findlay so that Reed could "take care of Brian [McQuistion]." (Tr. 699). In a police interview, Blakely stated that Reed was going to rob McQuistion or intimidate him into not testifying against him (Blakely). However, he eventually admitted that he knew that Reed was going "to kill Brian." (Tr. 700). At trial, Blakely also testified that, after McQuistion's death, Reed told him "that he killed Brian." (Tr. 762).

{¶35} Additionally, the police produced geolocation data that tracked Blakely's cellular phone on the night of November 25, 2017. The State then

presented the jury with security camera footage that placed Blakely at a gas station at the time of McQuistion's death. The State then introduced cell phone records that indicated Reed had called Blakely three times just after the time of the shooting at McQuistion's house. The evidence at trial indicates that, after Blakely had received a call from Reed, Blakely used Google to get directions to a location near Main Street.

**{¶36}** Blakely testified that he picked Reed up near the intersection of George Street and Main Street. The State presented geolocation data that indicates that Blakely's cellular phone went to the place he identified at trial. The State then presented additional security camera footage of a pedestrian walking down Main Street in this timeframe. Blakely identified this pedestrian as Reed. From this evidence, a reasonable trier of fact could conclude that the State presented sufficient evidence to establish that Reed committed the offense of aggravated murder.

**{¶37}** Next, Reed argues that the State failed to produce evidence that he was in possession of a firearm on the night of November 25, 2017. At trial, Kramer indicated that, since the bullet removed from McQuistion was damaged, testing could not conclude that the revolver located in Blakely's house was not the weapon that was used to kill McQuistion. Blakely testified that Reed had given this gun to him for protection and that Reed had spent the night before McQuistion's death at his (Blakely's) house.

{¶38} The State also introduced copies of text messages sent by Reed in which he told Blakely to "get rid of tht for good" because "tht got our life on it." (Ex. 94). Blakely testified that these texts were about disposing of the gun that was used * * * to kill Brian [McQuistion]." (Tr. 783). From this evidence, a reasonable trier of fact could infer that Reed was in possession of a firearm on the night of November 25, 2017 because McQuistion died from a gunshot wound and Blakely testified that Reed expressly admitted to killing McQuistion.

{¶39} Having examined the record in a light most favorable to the prosecution, we conclude that the State produced some evidence from which a reasonable trier of fact could conclude that Reed had committed the offenses of aggravated murder and having weapons while under disability. For this reason, Reed has failed to demonstrate that his convictions are not supported by legally sufficient evidence. Accordingly, the first assignment of error is overruled.

*Second Assignment of Error*

{¶40} Reed argues that his convictions for aggravated murder and having weapons while under disability are against the manifest weight of the evidence.

Legal Standard

{¶41} "A manifest-weight analysis examines whether the State has carried its burden of persuasion at trial." *State v. Carroll*, 2024-Ohio-1626, ¶ 58 (3d Dist.). On review, "an appellate court's function * * * is to determine whether the greater

amount of credible evidence supports the verdict." *State v. Harvey*, 2020-Ohio-329,

¶ 12 (3d Dist.), quoting *State v. Plott*, 2017-Ohio-38, ¶ 73 (3d Dist.).

> Appellate courts "must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the factfinder 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'"

*State v. Randle*, 2018-Ohio-207, ¶ 36 (3d Dist.), quoting *Plott* at ¶ 73, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997).

{¶42} In this analysis, "the credibility of witnesses is primarily a determination for the trier of fact." *Morris*, 2022-Ohio-3608, ¶ 41, quoting *State v. Banks*, 2011-Ohio-5671, ¶ 13 (8th Dist.). For this reason, an appellate court must "allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses." *Sullivan*, 2017-Ohio-8937, ¶ 38, quoting *State v. Coleman*, 2014-Ohio-5320, ¶ 7 (3d Dist.). "Only in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Hunter*, 2011-Ohio-6524, ¶ 119, quoting *Thompkins* at 387.

### Legal Analysis

{¶43} Reed raises three main arguments herein. He first argues that his convictions are against the manifest weight of the evidence because Blakely and Householder were not reliable witnesses. At trial, Blakely testified that he had been

charged with complicity to aggravated murder for his actions on November 25, 2017. However, pursuant to an agreement with the State, he pled guilty to a charge of complicity to involuntary manslaughter and was sentenced to serve thirteen years in prison. As part of this arrangement, he agreed to testify truthfully about the events surrounding McQuistion's death.

**{¶44}** Blakely was also questioned about his statements to the police in several interviews. Initially, he told the police that Reed drove by himself to McQuistion's house in his (Blakely's) car. But Blakely admitted that this was a lie after he was presented the camera footage of him at the gas station. Blakely also reported that he had dropped off Reed and another person named Natasha near to where McQuistion lived. However, he later admitted that no one else was in the car with him and Reed on the night of the murder. He testified that he had given Natasha's name to law enforcement "to get the heat off" of him and had lied to get out of trouble. (Tr. 729).

**{¶45}** Further, Blakely initially made "vague" statements to the detectives about why he drove Reed to where McQuistion lived. (Tr. 700). He had stated that Reed was going "to take care of Brian [McQuistion]" or was going to rob him. (Tr. 699). However, he ultimately admitted that he drove Reed to East Foulke Avenue, knowing that Reed intended to "kill Brian." (Tr. 700). At trial, Blakely also indicated that he had also been using synthetic marijuana. However, he testified that this drug use did not interfere with his ability to remember what had transpired.

Blakely also admitted to having been convicted for his drug-related activities in Wood County.

{¶46} At trial, Householder testified that, just before he heard a knock on the front door, he had gone into the bathroom to ingest cocaine. However, he stated that this did not interfere with his ability to remember the events of that evening clearly. He also stated that, after hearing the gunshot, he left the house without checking on McQuistion or attempting to render him any aid. Householder also admitted that he was not honest when he called 9-1-1 and told the dispatcher that he heard a gunshot while taking a walk. He stated that he was not forthcoming because he was scared for his life.

{¶47} Householder testified that, just after the shooting, he bought drugs from a person who went by the name "Dog." In one of his statements to the police, he had suggested that Dog might have been involved in the shooting. The basis for this belief was that he heard someone make a "D" sound at the door just before McQuistion was shot. However, he testified that he did not hear anyone say the name "Dog" at the door and simply gave this name as a potential lead. Householder also admitted that he was not honest in the first interview he had with the police. He indicated that, in a second interview, the police confronted him with statements from his girlfriend that were inconsistent with his story and that he then decided to be truthful.

{¶48} In this case, the jury was presented with extensive information about Blakely and Householder's criminal histories, their actions on November 25, 2017, their lies during this investigation, and their failures to be immediately forthcoming with the police. As the triers of fact, the jurors were free to believe all, some, or none of testimony provided by Blakely and Householder. *Harvey*, 2020-Ohio-329, ¶ 47. "A verdict is not against the manifest weight of the evidence because the [jury] chose to believe the State's witnesses rather than the defendant's version of the events." *State v. Hooper*, 2022-Ohio-2990, ¶ 29 (3d Dist.), quoting *State v. Martinez*, 2013-Ohio-3189, ¶ 16 (9th Dist.). Thus, the first argument is without merit.

{¶49} Next, Reed asserts that the geolocation data that was used to trace the movements of Blakely's phone was "junk science." (Appellant's Brief, 26). However, he has not raised any arguments in support of this assertion. Courts have routinely allowed the introduction of various forms of location data from cellular phones at trials. *State v. White*, 2015-Ohio-3512, ¶ 28 (2d Dist.); *State v. Morris*, 2023-Ohio-4021, ¶ 48 (3d Dist.); *State v. Gilmer*, 2024-Ohio-1178, ¶ 81 (6th Dist.); *State v. Hagwood*, 2023-Ohio-3970, ¶ 24-25 (8th Dist.).

{¶50} Reed also argues that this geolocation data could only establish that Blakely's phone—not Blakely—was at the gas station at the time of the homicide. However, the State also introduced images from a security camera that showed a person getting out of a white car at a gas station in the timeframe that the geolocation

data placed Blakely's phone in this area. At trial, Blakely identified himself as the person getting out this car. The jurors were presented with this testimony and given copies of these security camera images for their own evaluation. In this case, the geolocation data was not used in isolation to establish Blakely's whereabouts at the time of the homicide. Thus, the second argument is without merit.

**{¶51}** Finally, Reed asserts that his convictions are against the manifest weight of the evidence because the State did not perform testing that could link him to the revolver through DNA or fingerprint analyses. However, this Court has previously concluded that the absence of "physical evidence such as fingerprints or DNA linking [the defendant] to the firearm" does not render a conviction against the manifest weight of the evidence. *State v. Cassidy*, 2017-Ohio-8351, ¶ 20 (3d Dist.). *Carroll*, 2024-Ohio-1626, ¶ 15, citing *State v. Poindexter*, 2021-Ohio-1499, ¶ 22 (10th Dist.); *State v. Peabody*, 2024-Ohio-185, ¶ 54-55 (6th Dist.). Thus, the third argument is without merit.

**{¶52}** In conclusion, having reviewed the evidence in the record on the basis of its weight and credibility, we have found no indication that the finder of fact clearly lost its way and returned a verdict against the manifest weight of the evidence. Accordingly, the second assignment of error is overruled.

*Conclusion*

**{¶53}** Having found no error prejudicial to the appellant in the particulars assigned and argued, the judgment of the Hancock County Court of Common Pleas is affirmed.

***Judgment Affirmed***

**WALDICK and ZIMMERMAN, J.J., concur.**

**/hls**