[Cite as *State v. Yelton*, 2025-Ohio-2391.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SHELBY COUNTY

STATE OF OHIO,

    PLAINTIFF-APPPELLEE,

  v.

JOSEPH L. YELTON,

    DEFENDANT-APPELLANT.

CASE NO. 17-24-11

OPINION AND
JUDGMENT ENTRY

Appeal from Shelby County Municipal Court
Trial Court No. 24CRB00172

**Judgment Affirmed**

**Date of Decision: July 7, 2025**

APPEARANCES:

    *Katherine Ross-Kinzie* **for Appellant**

    *David M. Busick* **for Appellee**

**WALDICK, P.J.**

{¶1} Defendant-appellant, Joseph Yelton ("Yelton"), appeals the August 8, 2024 judgment of conviction and sentence entered against him in the Sidney Municipal Court, following a jury trial in which Yelton was found guilty of Resisting Arrest and Violating Protection Order. For the reasons that follow, we affirm.

*Procedural History*

{¶2} This case originated on April 3, 2024, when two criminal complaints were filed against Yelton in the trial court. In those complaints, Yelton was charged with Resisting Arrest, a second-degree misdemeanor in violation of R.C. 2921.33(A), and Violating Protection Order, a first-degree misdemeanor in violation of R.C. 2919.27(A). On April 12, 2024, Yelton filed a written plea of not guilty.

{¶3} On August 8, 2024, a jury trial was held in the case. At the close of the trial, the jury returned verdicts finding Yelton guilty of both charges. The trial court accepted the verdicts and sentenced Yelton to 30 days in jail for the resisting arrest charge and to 150 days in jail for the protection order violation, with the sentences to be served consecutively.

{¶4} On September 6, 2024, Yelton filed the instant appeal, in which he raises three assignments of error for our review.

**First Assignment of Error**

**The trial court violated Joseph Yelton's due-process rights when it convicted him of resisting arrest without legally sufficient evidence.**

**Second Assignment of Error**

**Mr. Yelton's convictions for violating a protection order and for resisting arrest are not supported by the manifest weight of the evidence.**

**Third Assignment of Error**

**Prosecutorial misconduct denied Joseph Yelton a fair trial and due process of law.**

*First and Second Assignments of Error*

{¶5} As the first and second assignments of error both require a review of the evidence presented at trial, we shall jointly address those assignments of error.

{¶6} The trial record reflects that the prosecution presented the testimony of five witnesses to the jury, in addition to admitting several exhibits. The defense presented the testimony of one witness and admitted one exhibit. Further, the parties stipulated that, on March 29, 2024, Yelton had been served with a valid civil protection order issued by the Shelby County Court of Common Pleas, a copy of which was introduced in evidence.

{¶7} With regard to the evidence presented by the prosecution, the state's first witness at trial was Officer Aaron Wesbecher, a 20-year veteran of the City of Sidney Police Department. Wesbecher testified that, on April 2, 2024, he was on duty, working day shift, when he was dispatched to a disturbance in an alley off

Vandemark Road in Sidney, with the alleyway being located between Precision Car Wash and Pizza Hut. While Wesbecher was enroute to that location, dispatch advised that the caller was Paula L. ("Paula") and that Yelton was one of the involved parties. During his trial testimony, Wesbecher identified audio-video footage recorded by his body camera during his interaction with the parties at the car wash, and that video recording was admitted in evidence and played for the jury at trial. The contents of that recording, along with Wesbecher's testimony, established that, upon arriving at the car wash on April 2, 2024, Wesbecher first spoke with Paula. Paula advised that Yelton had attempted to swing a knife at her and her significant other, Michael Payne. However, Wesbecher testified at trial that, under the circumstances, Paula's allegation regarding the knife appeared to have been false. Wesbecher also identified a civil protection order issued by the Shelby County Court of Common Pleas on March 29, 2024, which was in effect on April 2, 2024. That protection order had been obtained by Paula against Yelton and, among other things, required Yelton to stay away from Paula and to not be within 500 feet of her, wherever she may be found. Officer Wesbecher testified that, on April 2, 2024, he ultimately arrested Yelton in the area of the car wash because Yelton was well within 500 feet of Paula and did not leave the area immediately, as required by the terms of the protection order. Wesbecher also identified an aerial map depicting the car wash location and the alleyway between the car wash and

Pizza Hut, which corroborated Wesbecher's testimony that Yelton's truck had been parked approximately 150 feet from where Paula was located at the time.

{¶8} Paula L. testified that she has known Yelton for 16 or 17 years, and that she has a valid civil protection order against him that was issued by the Shelby County Court of Common Pleas. Paula testified that on April 2, 2024, at approximately 12:30 p.m., she was at Precision Car Wash on Vandemark Road, vacuuming her car. With her was her significant other, Michael, and her son and granddaughter. She heard Michael say something, which made her look up, and that is when she noticed Yelton driving his red truck, pulling into the alley that runs right by the car wash, in between that business and Pizza Hut. Paula testified that she looked up and made eye contact with Yelton. Yelton then drove down the alley a bit further and stopped his car in front of the fourth stall of the carwash, parking outside the stall. Paula testified that Yelton then got out of his vehicle and walked towards her. No words were exchanged between the two of them, but Yelton then got into an altercation with Michael. On cross-examination, Paula was questioned about the fact she had told the responding officer that day that Yelton had swung a knife at her. In response, Paula testified that Yelton made a gesture with a knife in Michael's direction, while Paula was walking over to help Michael.

{¶9} Another prosecution witness was James Slife, an employee of Precision Car Wash. Slife testified that he was working at the car wash on April 2, 2024 when an incident occurred in the parking lot. Slife testified that a man and a woman were

standing at the vacuum cleaner when a red pickup truck went by going west, then turned around and came back east-bound, and stopped near the Pizza Hut and then someone in the truck started yelling. Slife testified that the woman by the vacuum stayed where she was because it looked like she had her hands full with the children she had with her, but the man with her left the vacuum area and went towards the pickup truck. That man appeared to be angry and a verbal altercation ensued when he approached the truck. Slife was not able to identify the male who was driving the pickup truck, nor did Slife remember seeing the male get out of the pickup truck; however, Slife testified that a woman in the pickup truck got out and had something in her hand. Slife testified that the first man, the one who had initially been over by the vacuums, approached that woman but did not physically engage with her. Finally, Slife acknowledged that he was unable to remember every detail of the incident.

{¶10} Sergeant Scott White of the Sidney Police Department was the state's fourth witness at trial. White testified that on April 2, 2024, at approximately 12:30, he was dispatched to an incident near Kentucky Fried Chicken ("KFC") in Sidney. White testified that the nature of the call was a disturbance involving a protection order violation. White's body camera was activated upon his arrival at that location, and video footage from the camera was identified by White at trial and played for the jury. In conjunction with that video being played, Sergeant White testified that Officer Wesbecher utilized a "1095" radio code during the call, which

means to make an arrest. White testified that another officer on scene, Officer Dembski, told Yelton that he was under arrest. Sergeant White testified that Yelton was not compliant after being told he was under arrest. White testified that while Yelton did not physically resist arrest, he walked away from the officers and toward his own truck. White testified that when Yelton headed for his truck after being told he was under arrest, White was worried that Yelton might try to flee the scene. As a result, Yelton was threatened with TASER deployment due to his failure to comply with the officers. White testified that Yelton eventually complied, and was taken into custody by Officer Dembski. White testified that, based on his twenty years of experience, when an arrest command is issued to an individual by an officer, ideally the individual would do as instructed, and turn around and place their hands behind their back. Finally, Sergeant White testified that the distance from the furthest point of the car wash to the middle of KFC is 397 feet, meaning that even Yelton being at KFC would be a violation of a protection order if the protected party was at the car wash.

{¶11} The prosecution's final witness was Deputy Frank Bleigh of the Shelby County Sheriff's Office. Bleigh was working in that capacity on April 2, 2024, at approximately 12:30, when he heard radio traffic relating to an incident occurring in the area of the KFC, Pizza Hut, and the car wash on Vandemark Road in Sidney. As a result, Bleigh drove to that location, where Sidney Police Department officers were already present. After speaking briefly to one of the

witnesses, Bleigh observed Officer Dembski moving towards Yelton in order to arrest him. As Deputy Bleigh went to assist Officer Dembski, Bleigh drew his TASER after he observed Yelton resisting Dembski's orders relating to the arrest. Bleigh testified that while Yelton did not actively fight the officers while resisting arrest, Yelton would not comply with Dembski's order to turn around and place his hands behind his back. Instead, Yelton actually put his arms on the side of the pickup truck bed. Bleigh testified that, after he drew his TASER, Yelton ultimately complied with the officers' commands relating to their attempt to make the arrest. Bleigh confirmed that while he drew his TASER during the incident, it was not deployed.

{¶12} At trial, once the prosecution rested after presenting its case, Yelton took the stand in his own defense. Yelton testified that on April 2, 2024, he and his wife were on their way to Walmart in Sidney. While driving down Vandemark Road, Yelton said he noticed a number of cars up ahead of him. Because Yelton was in a hurry, he decided to cut through the alley between the car wash and Pizza Hut. Yelton testified that, while driving through the alley, he heard someone yelling at him. Yelton testified that he flipped off the unknown person and kept driving, when suddenly Michael Payne ran out in front of Yelton's truck, screaming and yelling at Yelton. Yelton's wife then jumped out of the truck. Yelton testified that he could not get his phone out to record what was happening, and so he drove on to some parking spots that are located back behind one of the buildings, where Yelton

sat to wait for the police.  Yelton testified that the police arrived and, after speaking to them, he was told he was under arrest.  Yelton testified that he asked the police why he was being arrested and they would not tell him.  Yelton denied ever entering the parking lot area in front of the car wash and testified that, while he saw a man standing there, he did not pay attention to who it was until Payne ran up in front of Yelton's truck.  Yelton testified that he never saw Paula.  Yelton testified that he was able to record part of the incident on April 2, 2024, and that recording was then played for the jury at trial.  Yelton testified that the car Paula and Michael had been standing by was not Paula's car and so he assumed it was Michael's.  With regard to his interaction with the police officers when they approached him and attempted to arrest him, Yelton testified that "They come up like that, and I don't – I don't like people trying to get up behind me like that.  I just – I don't like it, so I tried to back away from that situation so that way they weren't behind me and I could see everything." (Tr., 155).  Yelton testified that after being told he was under arrest, he then started walking towards his pickup truck, while demanding to be told why he was being arrested.  Yelton testified that the officers followed him and that one officer pulled out his TASER, and so Yelton grabbed onto his truck so he would not fall to the ground if the TASER was used on him.  Yelton acknowledged that, after asking why he was being arrested and not getting an immediate answer, he was told a few seconds later that the arrest was for violating a protection order.  On cross-examination, Yelton admitted that, upon pulling into the alleyway by the car wash,

he stopped in the alley and got out of his truck. Yelton testified that he only did that because he was forced by Payne to stop his vehicle.

{¶13} In the first assignment of error, Yelton argues that his conviction for Resisting Arrest is not based on sufficient evidence. In the second assignment of error, Yelton argues that his convictions for Resisting Arrest and Violating Protection Order are both against the manifest weight of the evidence.

{¶14} It is well established that "[t]he legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." *State v. Thompkins*, 78 Ohio St.3d 380 (1997), paragraph two of the syllabus.

{¶15} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St. 3d 259 (1991), paragraph two of the syllabus. Consequently, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* "'In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact.'" *State v. Williams*, 2024-Ohio 2307, ¶ 21 (3d Dist.), quoting *State v. Jones*, 2013-Ohio-4775, ¶ 33 (1st Dist.).

{¶16} By contrast, when reviewing whether a verdict was against the manifest weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the conflicting testimony. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). In doing so, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the factfinder "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id.* Nevertheless, when assessing a manifest-weight challenge, a reviewing court must allow the trier-of-fact appropriate discretion on matters relating to the credibility of the witnesses. *State v. Stewart*, 2023-Ohio-253, ¶ 11 (3d Dist.), citing *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 3d Dist. Allen No. 2012-Ohio-5233, ¶ 9 (3d Dist.), quoting *State v. Hunter*, 2011-Ohio-6524, ¶ 119.

{¶17} In the instant case, Yelton was convicted of Resisting Arrest in violation of R.C. 2921.33(A), which provides that "[n]o person, recklessly or by force, shall resist or interfere with a lawful arrest of the person or another", and of Violating Protection Order in violation of R.C. 2919.27(A)(2), which provides that "[n]o person shall recklessly violate the terms of * * * [a] protection order issued pursuant to section 2151.34, 2903.213, or 2903.214 of the Revised Code[.]"

{¶18} In the first assignment of error on appeal, Yelton argues that, as to his conviction for Resisting Arrest, there was insufficient evidence to prove he acted recklessly or by force.

{¶19} Pursuant to R.C. 2921.33(A), *supra*, a person can resist arrest either recklessly or by force. "A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature." R.C. 2901.22(C). The term "force" means "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1).

{¶20} In the instant case, the prosecution did not suggest at trial, and does not argue on appeal, that Yelton acted forcibly in resisting arrest. Rather, the state asserts – as it did in the trial court – that, on the facts of this case, Yelton recklessly resisted or interfered with his arrest.

{¶21} The Ohio Jury Instructions for the offense of Resisting Arrest define "resist or interfere" as meaning "to oppose, obstruct, hinder, impede, interrupt, or prevent an arrest by a law-enforcement officer." 2 OJI-CR 521.33 (Rev. May 22, 2021).

{¶22} "[D]elaying an arrest by preventing the seizure or detention of a person may constitute resisting arrest because it constitutes reckless resistance." *State v. Hicks*, 2011-Ohio-2769, ¶ 19 (9th Dist.). "By committing an act giving rise to the

-12-

delay, a person may be proceeding with heedless indifference to the consequences and disregarding a known risk that his conduct will prevent arrest." *Id*.

**{¶23}** In light of the applicable legal definitions, we find in the instant case that there was sufficient evidence presented at trial that, when viewed in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of recklessly resisting arrest proven beyond a reasonable doubt.

**{¶24}** The evidence in the record, particularly the multiple audio-video recordings of Yelton's arrest, reflects that Yelton was standing outside of his truck at the point that the police officers began slowly moving toward him in order to take Yelton into custody. As the officers were approaching Yelton, he began backing away from the officers. After clearly being told that he was being placed under arrest, Yelton said "nope, nope, I ain't doing it", and then walked away from the officers, toward the driver's side of his parked truck. Yelton continued to ignore the lawful arrest commands issued by the police, and then walked to the back of his truck, where he refused to turn around and continued to move his arms around, placing them in multiple positions, but not behind his back as instructed by the officers. While doing so, Yelton also continued to argue with the officers about the situation. Yelton's refusal to comply with the officers' attempt to arrest him continued for approximately 40 seconds and it was only after one officer finally pointed a TASER at Yelton that he submitted to the officers' instructions and permitted himself to be taken into custody.

{¶25} Such evidence, if believed, would convince the average mind of the defendant's guilt of Resisting Arrest beyond a reasonable doubt, and we therefore find that there was sufficient evidence to convict Yelton for recklessly resisting arrest.

{¶26} In the second assignment of error, Yelton argues that his convictions for Resisting Arrest and Violating Protection Order were against the manifest weight of the evidence.

{¶27} With regard to the resisting arrest conviction, Yelton again maintains that he did not recklessly resist arrest and argues that the jury lost its way when it discounted his trial testimony and found him guilty of that charge.

{¶28} As previously detailed above, Yelton testified at trial that, when approached by the officers, he tried to back away because he did not want the officers behind him and he wanted to be able to see everything. Yelton also testified that he walked away from the officers because they would not tell him why he was under arrest, although he acknowledged that he was informed a few seconds later that the arrest was for violating a protection order. Yelton also suggested in his trial testimony that he failed to comply with the officers because he was scared that he would be tased and therefore he grabbed onto his truck to avoid falling to the ground if the TASER was used on him.

{¶29} Contrary to Yelton's claim on appeal, these "explanations" provided at trial by Yelton do not render his resisting arrest conviction against the manifest

weight of the evidence. Indeed, Yelton's testimony at trial – if believed – actually served to confirm that he not only recklessly resisted arrest by trying to delay and avoid the same, but that he did so purposely. Moreover, to the extent that the jury may have discounted Yelton's testimony, as he argues on appeal, we note that the finder of fact is free to believe all, some, or none of the testimony of each witness. *State v. Harvey*, 2020-Ohio-329, ¶ 47 (3d Dist.).

**{¶30}** After thoroughly examining the evidence in the record before us, we cannot say that the jurors lost their way in finding Yelton guilty of Resisting Arrest, or that the guilty verdict on that charge was against the manifest weight of the evidence.

**{¶31}** With regard to the conviction for Violating Protection Order, Yelton similarly maintains that he did not recklessly violate the protection order at issue. He argues that the jury lost its way when it apparently found the victim's testimony more credible than that given by Yelton.

**{¶32}** As noted above, R.C. 2919.27(A) prohibits the reckless violation of a protection order. Again, "[a] person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature." R.C. 2901.22(C). "A person is reckless with respect to circumstances when, with heedless indifference to the consequences, the person

disregards a substantial and unjustifiable risk that such circumstances are likely to exist." *Id*.

**{¶33}** In this case, it is uncontested that Paula had a valid protection order against Yelton, prohibiting him from being within 500 feet of Paula, and requiring him to depart *immediately* if he accidentally came in contact with her in any public or private place. (Plaintiff's Exhibit D, emphasis *sic*.)

**{¶34}** Paula testified that on April 2, 2024, she was at the car wash when Yelton came driving by on the alleyway that ran alongside the business premises. Testimony and exhibits admitted at trial established that Paula's position was well within 500 feet from where Yelton drove by her and also from the location where he ultimately parked his vehicle. While Yelton testified at trial that he did not see Paula at the car wash, Paula testified that she made eye contact with Yelton, and that he initially got out of his truck and walked toward her and her boyfriend. Additionally, a seemingly impartial witness, James Slife, testified that Yelton drove by once and then turned around and came back to the general area where Paula and her boyfriend were located.

**{¶35}** Given that evidence, we cannot conclude that the jury lost its way and created such a manifest miscarriage of justice as to its credibility determination that would require reversal of Yelton's conviction relating to the protection order violation. While the credibility of the witnesses may have been the primary factor in determining guilt as to that charge, "the choice between credible witnesses and

their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact." *State v. White*, 2017-Ohio-1488, ¶ 50 (3d Dist.). As noted above, the finder of fact is free to believe all, some, or none of the testimony of each witness. *State v. Harvey*, *supra*, at ¶ 47.

{¶36} As a result, after having reviewed the record in its entirety, weighed the evidence and all reasonable inferences, we conclude that Yelton's conviction for Violating Protection Order is not against the manifest weight of the evidence.

{¶37} The first and second assignments of error are overruled.

*Third Assignment of Error*

{¶38} In the third assignment of error, Yelton asserts that his conviction must be reversed due to prosecutorial misconduct. Specifically, Yelton argues that the prosecutor impermissibly relied on facts not in evidence when addressing Yelton's credibility during the state's final closing argument.

{¶39} "The conduct of a prosecuting attorney during trial cannot be made a ground of error unless the conduct deprives defendant of a fair trial." *State v. Apanovitch*, 33 Ohio St.3d 19, 24 (1987). Prosecutorial misconduct constitutes reversible error only in rare instances. *State v. Keenan*, 66 Ohio St. 3d 402, 405 (1993). If established, misconduct on the part of the prosecution may violate a defendant's due process rights; therefore, the "touchstone of the analysis 'is the fairness of the trial, not the culpability of the prosecutor.'" *State v. Thompson*, 2014-Ohio-4751, ¶ 162, quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982). The effect

of any misconduct must be considered in light of the whole trial. *State v. Durr*, 58 Ohio St.3d 86, 94 (1991).

{¶40} "A prosecutor is entitled * * * to 'wide latitude in summation as to what the evidence has shown and what reasonable inferences may be drawn therefrom.'" *State v. McKelton*, 2016-Ohio-5735, ¶ 274, quoting *State v. Stephens*, 24 Ohio St.2d 76, 82 (1970). "The test regarding prosecutorial misconduct during closing arguments is whether the remarks were improper and, if so, whether they prejudicially affected the substantial rights of the defendant." *State v. Manley*, 2011-Ohio-5082, ¶ 14 (3d Dist.).

{¶41} "In making this determination, an appellate court should consider several factors: (1) the nature of the remarks, (2) whether an objection was made by counsel, (3) whether corrective instructions were given by the court, and (4) the strength of the evidence against the defendant." *State v. Braxton*, 102 Ohio App.3d 28, 41 (1995). "We evaluate the allegedly improper statements in the context of the entire trial." *State v. Klein*, 2013-Ohio-2387, ¶ 60 (3d Dist.), citing *State v. Treesh*, 90 Ohio St.3d 460, 464 (2001).

{¶42} In the instant case, during the state's final closing argument, the prosecutor argued that Yelton's testimony about the events at issue was not credible for several reasons. While making that argument, the prosecutor addressed Yelton's testimony that suggested he only drove by the car wash on the day in question because he was trying to avoid traffic at an intersection by cutting through the alley.

In asserting during closing argument that such testimony was not credible, the prosecutor stated as follows:

> If anyone suggests to me that the best way to get through there, especially when McDonald's was closed and the alley behind McDonald's was closed because McDonald's got tore down – some of you may recall that from your independent recollection. The alley was closed. So how do you beat a light by going back down an alley and turning down McDonald's when McDonald's parking lot was closed for construction?

(Tr., 190).

{¶43} On appeal, Yelton argues that there was no evidence presented at trial relating to McDonald's being closed and, therefore, the prosecutor's argument was improper and prejudicial.

{¶44} In analyzing Yelton's prosecutorial misconduct claim, we first note that there was no objection at trial to the portion of the state's closing argument with which Yelton assigns error on appeal. Thus, as to the remarks at issue, Yelton's failure to object forfeited all but plain error. See, *e.g.*, *State v. Wilks*, 2018-Ohio-1562, ¶ 171. To establish plain error under Crim.R. 52(B), the party asserting error must demonstrate that an error occurred, that the error was plain, and that the error affected his substantial rights. *State v. Bond*, 2022-Ohio-4150, ¶ 17. The Supreme Court of Ohio has interpreted the third prong of that standard to mean that the error must have affected the outcome of the trial. *Id.*

{¶45} In the instant case, upon reviewing the closing remarks at issue in the context of the overall record, we find that the remarks fall well short of plain error.

**{¶46}** While the record supports Yelton's claim that there was no trial testimony about the McDonald's having been closed and torn down, there was some evidence introduced about a McDonald's located in the vicinity of the location at issue and the fact that there had been some construction in that area at some point. Whether the prosecutor was referring to what he mistakenly believed to be in evidence or to information outside of the evidence is not entirely clear from the phrasing of the comments at issue.

**{¶47}** Regardless, to the extent the prosecutor specifically suggested that the jury consider the status of the purportedly closed McDonald's parking lot, or access thereto, in evaluating the credibility of Yelton's testimony, the prosecutor's comments may constitute error as such argument "invites the jury to speculate on facts not in evidence." *State v. Wogenstahl*, 75 Ohio St.3d 344, 357. However, those comments were mitigated by the trial court's instruction to the jury that closing arguments by counsel are not evidence. *State v. Garrett*, 2022-Ohio-4218, ¶ 158, citing *State v. Kirkland*, 2020-Ohio-4079, ¶ 117.

**{¶48}** More importantly, after examining the prosecutor's statements under the four factors set forth above, we do not find that the statements constituted plain error. Yelton has failed to demonstrate that the prosecutor's comments affected Yelton's substantial rights or that, but for the statements, the jury would have found Yelton not guilty. As detailed in our analysis of the first and second assignments of

Case No. 17-24-11

error, *supra*, the prosecution presented more than ample other evidence at trial upon which the jury could find Yelton guilty of the two offenses at issue.

**{¶49}** Thus, for all of those reasons, Yelton has failed to demonstrate reversible prosecutorial misconduct with regard to closing arguments.

**{¶50}** The third assignment of error is overruled.

*Conclusion*

**{¶51}** Having found no error prejudicial to the defendant-appellant in the particulars assigned and argued, the judgment of the Municipal Court of Sidney, Ohio is affirmed.

*Judgment affirmed*

**MILLER and WILLAMOWSKI, J.J., concur.**

Case No. 17-24-11

# **JUDGMENT ENTRY**

For the reasons stated in the opinion of this Court, the assignments of error are overruled and it is the judgment and order of this Court that the judgment of the trial court is affirmed with costs assessed to Appellant for which judgment is hereby rendered.  The cause is hereby remanded to the trial court for execution of the judgment for costs.

It is further ordered that the Clerk of this Court certify a copy of this Court's judgment entry and opinion to the trial court as the mandate prescribed by App.R. 27; and serve a copy of this Court's judgment entry and opinion on each party to the proceedings and note the date of service in the docket.  See App.R. 30.

Juergen A. Waldick, Judge

Mark C. Miller, Judge

John R. Willamowski, Judge

DATED:
/jlm

-22-